DENNIS ET AL. v. UNITED STATES.

No. 336. Argued December 4, 1950.—Decided June 4, 1951.

*George W. Crockett, Jr., Abraham J. Isserman* and *Harry Sacher* argued the cause for petitioners. With them on the brief was *Richard Gladstein.*

*Solicitor General Perlman* and *Irving S. Shapiro* argued the cause for the United States. With them on the brief were *Attorney General McGrath, Assistant Attorney General McInerney, Irving H. Saypol, Robert W. Ginnane, Frank H. Gordon, Edward C. Wallace* and *Lawrence K. Bailey.*

MR. CHIEF JUSTICE VINSON announced the judgment of the Court and an opinion in which MR. JUSTICE REED, MR. JUSTICE BURTON and MR. JUSTICE MINTON join.

Petitioners were indicted in July, 1948, for violation of the conspiracy provisions of the Smith Act, 54 Stat. 671, 18 U. S. C. (1946 ed.) § 11, during the period of April, 1945, to July, 1948. The pretrial motion to quash the indictment on the grounds, *inter alia,* that the statute was unconstitutional was denied, *United States* v. *Foster,* 80 F. Supp. 479, and the case was set for trial on January 17, 1949. A verdict of guilty as to all the petitioners was returned by the jury on October 14, 1949. The Court of Appeals affirmed the convictions. 183 F. 2d 201. We granted certiorari, 340 U. S. 863, limited to the following two questions: (1) Whether either § 2 or § 3 of the Smith

Act, inherently or as construed and applied in the instant case, violates the First Amendment and other provisions of the Bill of Rights; (2) whether either § 2 or § 3 of the Act, inherently or as construed and applied in the instant case, violates the First and Fifth Amendments because of indefiniteness.

Sections 2 and 3 of the Smith Act, 54 Stat. 671, 18 U. S. C. (1946 ed.) §§ 10, 11 (see present 18 U. S. C. § 2385), provide as follows:

"SEC. 2. (a) It shall be unlawful for any person—

"(1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government;

"(2) with intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence;

"(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof.

"(b) For the purposes of this section, the term 'government in the United States' means the Government of the United States, the government of any State, Territory, or possession of the United States, the government of the District of Columbia, or the

government of any political subdivision of any of them.

"SEC. 3. It shall be unlawful for any person to attempt to commit, or to conspire to commit, any of the acts prohibited by the provisions of this title."

The indictment charged the petitioners with wilfully and knowingly conspiring (1) to organize as the Communist Party of the United States of America a society, group and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence, and (2) knowingly and wilfully to advocate and teach the duty and necessity of overthrowing and destroying the Government of the United States by force and violence. The indictment further alleged that § 2 of the Smith Act proscribes these acts and that any conspiracy to take such action is a violation of § 3 of the Act.

The trial of the case extended over nine months, six of which were devoted to the taking of evidence, resulting in a record of 16,000 pages. Our limited grant of the writ of certiorari has removed from our consideration any question as to the sufficiency of the evidence to support the jury's determination that petitioners are guilty of the offense charged. Whether on this record petitioners did in fact advocate the overthrow of the Government by force and violence is not before us, and we must base any discussion of this point upon the conclusions stated in the opinion of the Court of Appeals, which treated the issue in great detail. That court held that the record in this case amply supports the necessary finding of the jury that petitioners, the leaders of the Communist Party in this country, were unwilling to work within our framework of democracy, but intended to initiate a violent revolution whenever the propitious occasion appeared. Petitioners dispute the meaning to be drawn from the evidence, contending that the Marxist-

498

Leninist doctrine they advocated taught that force and violence to achieve a Communist form of government in an existing democratic state would be necessary only because the ruling classes of that state would never permit the transformation to be accomplished peacefully, but would use force and violence to defeat any peaceful political and economic gain the Communists could achieve. But the Court of Appeals held that the record supports the following broad conclusions: By virtue of their control over the political apparatus of the Communist Political Association,[1] petitioners were able to transform that organization into the Communist Party; that the policies of the Association were changed from peaceful cooperation with the United States and its economic and political structure to a policy which had existed before the United States and the Soviet Union were fighting a common enemy, namely, a policy which worked for the overthrow of the Government by force and violence; that the Communist Party is a highly disciplined organization, adept at infiltration into strategic positions, use of aliases, and double-meaning language; that the Party is rigidly controlled; that Communists, unlike other political parties, tolerate no dissension from the policy laid down by the guiding forces, but that the approved program is slavishly followed by the members of the Party; that the literature of the Party and the statements and activities of its leaders, petitioners here, advocate, and the general goal of the Party was, during the period in question, to achieve a successful overthrow of the existing order by force and violence.

---

[1] Following the dissolution of the Communist International in 1943, the Communist Party of the United States dissolved and was reconstituted as the Communist Political Association. The program of this Association was one of cooperation between labor and management, and, in general, one designed to achieve national unity and peace and prosperity in the post-war period.

## I.

It will be helpful in clarifying the issues to treat next the contention that the trial judge improperly interpreted the statute by charging that the statute required an unlawful intent before the jury could convict. More specifically, he charged that the jury could not find the petitioners guilty under the indictment unless they found that petitioners had the intent to "overthrow . . . the Government of the United States by force and violence as speedily as circumstances would permit."

Section 2 (a) (1) makes it unlawful "to knowingly or willfully advocate, . . . or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence . . . ."; Section 2 (a) (3), "to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow . . . ." Because of the fact that § 2 (a) (2) expressly requires a specific intent to overthrow the Government, and because of the absence of precise language in the foregoing subsections, it is claimed that Congress deliberately omitted any such requirement. We do not agree. It would require a far greater indication of congressional desire that intent not be made an element of the crime than the use of the disjunctive "knowingly or willfully" in § 2 (a) (1), or the omission of exact language in § 2 (a) (3). The structure and purpose of the statute demand the inclusion of intent as an element of the crime. Congress was concerned with those who advocate and organize for the overthrow of the Government. Certainly those who recruit and combine for the purpose of advocating overthrow intend to bring about that overthrow. We hold that the statute requires as an essential element of the crime proof of the intent of those who are charged with its violation to overthrow the Government by force and violence. See

*Williams* v. *United States,* 341 U. S. 97, 101–102 (1951); *Screws* v. *United States,* 325 U. S. 91, 101–105 (1945); *Cramer* v. *United States,* 325 U. S. 1, 31 (1945).

Nor does the fact that there must be an investigation of a state of mind under this interpretation afford any basis for rejection of that meaning. A survey of Title 18 of the U. S. Code indicates that the vast majority of the crimes designated by that Title require, by express language, proof of the existence of a certain mental state, in words such as "knowingly," "maliciously," "wilfully," "with the purpose of," "with intent to," or combinations or permutations of these and synonymous terms. The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence. See *American Communications Assn.* v. *Douds,* 339 U. S. 382, 411 (1950).

It has been suggested that the presence of intent makes a difference in the law when an "act otherwise excusable or carrying minor penalties" is accompanied by such an evil intent. Yet the existence of such an intent made the killing condemned in *Screws, supra,* and the beating in *Williams, supra,* both clearly and severely punishable under state law, offenses constitutionally punishable by the Federal Government. In those cases, the Court required the Government to prove that the defendants *intended* to deprive the victim of a constitutional right. If that precise mental state may be an essential element of a crime, surely an intent to overthrow the Government of the United States by advocacy thereof is equally susceptible of proof.[2]

---

[2] We have treated this point because of the discussion accorded it by the Court of Appeals and its importance to the administration of this statute, compare *Johnson* v. *United States,* 318 U. S. 189 (1943), although petitioners themselves requested a charge similar to the one given, and under Rule 30 of the Federal Rules of Criminal Procedure would appear to be barred from raising this point on appeal. Cf. *Boyd* v. *United States,* 271 U. S. 104 (1926).

## II.

The obvious purpose of the statute is to protect existing Government, not from change by peaceable, lawful and constitutional means, but from change by violence, revolution and terrorism. That it is within the *power* of the Congress to protect the Government of the United States from armed rebellion is a proposition which requires little discussion. Whatever theoretical merit there may be to the argument that there is a "right" to rebellion against dictatorial governments is without force where the existing structure of the government provides for peaceful and orderly change. We reject any principle of governmental helplessness in the face of preparation for revolution, which principle, carried to its logical conclusion, must lead to anarchy. No one could conceive that it is not within the power of Congress to prohibit acts intended to overthrow the Government by force and violence. The question with which we are concerned here is not whether Congress has such *power,* but whether the *means* which it has employed conflict with the First and Fifth Amendments to the Constitution.

One of the bases for the contention that the means which Congress has employed are invalid takes the form of an attack on the face of the statute on the grounds that by its terms it prohibits academic discussion of the merits of Marxism-Leninism, that it stifles ideas and is contrary to all concepts of a free speech and a free press. Although we do not agree that the language itself has that significance, we must bear in mind that it is the duty of the federal courts to interpret federal legislation in a manner not inconsistent with the demands of the Constitution. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 407 (1950). We are not here confronted with cases similar to *Thornhill* v. *Alabama,* 310 U. S. 88 (1940); *Herndon* v. *Lowry,* 301 U. S. 242 (1937); and *De Jonge* v. *Oregon,* 299 U. S. 353 (1937),

502

where a state court had given a meaning to a state statute which was inconsistent with the Federal Constitution. This is a federal statute which we must interpret as well as judge. Herein lies the fallacy of reliance upon the manner in which this Court has treated judgments of state courts. Where the statute as construed by the state court transgressed the First Amendment, we could not but invalidate the judgments of conviction.

The very language of the Smith Act negates the interpretation which petitioners would have us impose on that Act. It is directed at advocacy, not discussion. Thus, the trial judge properly charged the jury that they could not convict if they found that petitioners did "no more than pursue peaceful studies and discussions or teaching and advocacy in the realm of ideas." He further charged that it was not unlawful "to conduct in an American college or university a course explaining the philosophical theories set forth in the books which have been placed in evidence." Such a charge is in strict accord with the statutory language, and illustrates the meaning to be placed on those words. Congress did not intend to eradicate the free discussion of political theories, to destroy the traditional rights of Americans to discuss and evaluate ideas without fear of governmental sanction. Rather Congress was concerned with the very kind of activity in which the evidence showed these petitioners engaged.

## III.

But although the statute is not directed at the hypothetical cases which petitioners have conjured, its application in this case has resulted in convictions for the teaching and advocacy of the overthrow of the Government by force and violence, which, even though coupled with the intent to accomplish that overthrow, contains an element of speech. For this reason, we must pay special

heed to the demands of the First Amendment marking out the boundaries of speech.

We pointed out in *Douds, supra,* that the basis of the First Amendment is the hypothesis that speech can rebut speech, propaganda will answer propaganda, free debate of ideas will result in the wisest governmental policies. It is for this reason that this Court has recognized the inherent value of free discourse. An analysis of the leading cases in this Court which have involved direct limitations on speech, however, will demonstrate that both the majority of the Court and the dissenters in particular cases have recognized that this is not an unlimited, unqualified right, but that the societal value of speech must, on occasion, be subordinated to other values and considerations.

No important case involving free speech was decided by this Court prior to *Schenck* v. *United States,* 249 U. S. 47 (1919). Indeed, the summary treatment accorded an argument based upon an individual's claim that the First Amendment protected certain utterances indicates that the Court at earlier dates placed no unique emphasis upon that right.[3] It was not until the classic dictum of Justice Holmes in the *Schenck* case that speech *per se* received that emphasis in a majority opinion. That case involved a conviction under the Criminal Espionage Act, 40 Stat. 217. The question the Court faced was whether the evidence was sufficient to sustain the conviction. Writing for a unanimous Court, Justice Holmes stated that the "question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right

---

[3] *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402 (1918); *Fox* v. *Washington,* 236 U. S. 273 (1915); *Davis* v. *Massachusetts,* 167 U. S. 43 (1897); see *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 439 (1911); *Robertson* v. *Baldwin,* 165 U. S. 275, 281 (1897).

to prevent." 249 U. S. at 52. But the force of even this expression is considerably weakened by the reference at the end of the opinion to *Goldman* v. *United States,* 245 U. S. 474 (1918), a prosecution under the same statute. Said Justice Holmes, "Indeed [*Goldman*] might be said to dispose of the present contention if the precedent covers all *media concludendi.* But as the right to free speech was not referred to specially, we have thought fit to add a few words." 249 U. S. at 52. The fact is inescapable, too, that the phrase bore no connotation that the danger was to be any threat to the safety of the Republic. The charge was causing and attempting to cause insubordination in the military forces and obstruct recruiting. The objectionable document denounced conscription and its most inciting sentence was, "You must do your share to maintain, support and uphold the rights of the people of this country." 249 U. S. at 51. Fifteen thousand copies were printed and some circulated. This insubstantial gesture toward insubordination in 1917 during war was held to be a clear and present danger of bringing about the evil of military insubordination.

In several later cases involving convictions under the Criminal Espionage Act, the nub of the evidence the Court held sufficient to meet the "clear and present danger" test enunciated in *Schenck* was as follows: *Frohwerk* v. *United States,* 249 U. S. 204 (1919)—publication of twelve newspaper articles attacking the war; *Debs* v. *United States,* 249 U. S. 211 (1919)—one speech attacking United States' participation in the war; *Abrams* v. *United States,* 250 U. S. 616 (1919)—circulation of copies of two different socialist circulars attacking the war; *Schaefer* v. *United States,* 251 U. S. 466 (1920)—publication of a German-language newspaper with allegedly false articles, critical of capitalism and the war; *Pierce* v. *United States,* 252 U. S. 239 (1920)—circulation of copies of a four-page pamphlet written by a clergyman, attack-

ing the purposes of the war and United States' participation therein. Justice Holmes wrote the opinions for a unanimous Court in *Schenck, Frohwerk* and *Debs.* He and Justice Brandeis dissented in *Abrams, Schaefer* and *Pierce.* The basis of these dissents was that, because of the protection which the First Amendment gives to speech, the evidence in each case was insufficient to show that the defendants had created the requisite danger under *Schenck.* But these dissents did not mark a change of principle. The dissenters doubted only the probable effectiveness of the puny efforts toward subversion. In *Abrams,* they wrote, "I do not doubt for a moment that by the same reasoning that would justify punishing persuasion to murder, the United States constitutionally may punish speech that produces or is intended to produce a clear and imminent danger that it will bring about forthwith certain substantive evils that the United States constitutionally may seek to prevent." 250 U. S. at 627. And in *Schaefer* the test was said to be one of "degree," 251 U. S. at 482, although it is not clear whether "degree" refers to clear and present danger or evil. Perhaps both were meant.

The rule we deduce from these cases is that where an offense is specified by a statute in nonspeech or nonpress terms, a conviction relying upon speech or press as evidence of violation may be sustained only when the speech or publication created a "clear and present danger" of attempting or accomplishing the prohibited crime, *e. g.,* interference with enlistment. The dissents, we repeat, in emphasizing the value of speech, were addressed to the argument of the sufficiency of the evidence.

The next important case [4] before the Court in which free speech was the crux of the conflict was *Gitlow* v. *New York,* 268 U. S. 652 (1925). There New York had

---

[4] Cf. *Gilbert* v. *Minnesota,* 254 U. S. 325 (1920).

made it a crime to advocate "the necessity or propriety of overthrowing . . . organized government by force . . . ." The evidence of violation of the statute was that the defendant had published a Manifesto attacking the Government and capitalism. The convictions were sustained, Justices Holmes and Brandeis dissenting. The majority refused to apply the "clear and present danger" test to the specific utterance. Its reasoning was as follows: The "clear and present danger" test was applied to the utterance itself in *Schenck* because the question was merely one of sufficiency of evidence under an admittedly constitutional statute. *Gitlow,* however, presented a different question. There a legislature had found that a certain kind of speech was, itself, harmful and unlawful. The constitutionality of such a state statute had to be adjudged by this Court just as it determined the constitutionality of any state statute, namely, whether the statute was "reasonable." Since it was entirely reasonable for a state to attempt to protect itself from violent overthrow, the statute was perforce reasonable. The only question remaining in the case became whether there was evidence to support the conviction, a question which gave the majority no difficulty. Justices Holmes and Brandeis refused to accept this approach, but insisted that wherever speech was the evidence of the violation, it was necessary to show that the speech created the "clear and present danger" of the substantive evil which the legislature had the right to prevent. Justices Holmes and Brandeis, then, made no distinction between a federal statute which made certain acts unlawful, the evidence to support the conviction being speech, and a statute which made speech itself the crime. This approach was emphasized in *Whitney* v. *California,* 274 U. S. 357 (1927), where the Court was confronted with a conviction under the California Criminal Syndicalist statute. The Court sustained the conviction, Justices Brandeis and Holmes

concurring in the result. In their concurrence they repeated that even though the legislature had designated certain speech as criminal, this could not prevent the defendant from showing that there was no danger that the substantive evil would be brought about.

Although no case subsequent to *Whitney* and *Gitlow* has expressly overruled the majority opinions in those cases, there is little doubt that subsequent opinions have inclined toward the Holmes-Brandeis rationale.[5] And in *American Communications Assn.* v. *Douds, supra,* we were called upon to decide the validity of § 9 (h) of the Labor Management Relations Act of 1947. That section required officials of unions which desired to avail themselves of the facilities of the National Labor Relations Board to take oaths that they did not belong to the Communist Party and that they did not believe in the overthrow of the Government by force and violence. We pointed out that Congress did not intend to punish belief, but rather intended to regulate the conduct of union affairs. We therefore held that any indirect sanction on speech which might arise from the oath requirement did not present a proper case for the "clear and present danger" test, for the regulation was aimed at conduct rather than speech. In discussing the proper measure of evaluation of this kind of legislation, we suggested that the Holmes-Brandeis philosophy insisted that where

---

[5] *Contempt of court: Craig* v. *Harney,* 331 U. S. 367, 373 (1947); *Pennekamp* v. *Florida,* 328 U. S. 331, 333–336 (1946); *Bridges* v. *California,* 314 U. S. 252, 260–263 (1941).

*Validity of state statute: Thomas* v. *Collins,* 323 U. S. 516, 530 (1945); *Taylor* v. *Mississippi,* 319 U. S. 583, 589–590 (1943); *Thornhill* v. *Alabama,* 310 U. S. 88, 104–106 (1940).

*Validity of local ordinance or regulation: West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 639 (1943); *Carlson* v. *California,* 310 U. S. 106, 113 (1940).

*Common law offense: Cantwell* v. *Connecticut,* 310 U. S. 296, 308, 311 (1940).

there was a direct restriction upon speech, a "clear and present danger" that the substantive evil would be caused was necessary before the statute in question could be constitutionally applied. And we stated, "[The First] Amendment requires that one be permitted to believe what he will. It requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial public evil will result therefrom." 339 U. S. at 412. But we further suggested that neither Justice Holmes nor Justice Brandeis ever envisioned that a shorthand phrase should be crystallized into a rigid rule to be applied inflexibly without regard to the circumstances of each case. Speech is not an absolute, above and beyond control by the legislature when its judgment, subject to review here, is that certain kinds of speech are so undesirable as to warrant criminal sanction. Nothing is more certain in modern society than the principle that there are no absolutes, that a name, a phrase, a standard has meaning only when associated with the considerations which gave birth to the nomenclature. See *American Communications Assn.* v. *Douds,* 339 U. S. at 397. To those who would paralyze our Government in the face of impending threat by encasing it in a semantic straitjacket we must reply that all concepts are relative.

In this case we are squarely presented with the application of the "clear and present danger" test, and must decide what that phrase imports. We first note that many of the cases in which this Court has reversed convictions by use of this or similar tests have been based on the fact that the interest which the State was attempting to protect was itself too insubstantial to warrant restriction of speech. In this category we may put such cases as *Schneider* v. *State,* 308 U. S. 147 (1939); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940); *Martin* v. *Struthers,* 319 U. S. 141 (1943); *West Virginia Board of Educa-*

*tion* v. *Barnette,* 319 U. S. 624 (1943); *Thomas* v. *Collins,* 323 U. S. 516 (1945); *Marsh* v. *Alabama,* 326 U. S. 501 (1946); but cf. *Prince* v. *Massachusetts,* 321 U. S. 158 (1944); *Cox* v. *New Hampshire,* 312 U. S. 569 (1941). Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech. Indeed, this is the ultimate value of any society, for if a society cannot protect its very structure from armed internal attack, it must follow that no subordinate value can be protected. If, then, this interest may be protected, the literal problem which is presented is what has been meant by the use of the phrase "clear and present danger" of the utterances bringing about the evil within the power of Congress to punish.

Obviously, the words cannot mean that before the Government may act, it must wait until the *putsch* is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required. The argument that there is no need for Government to concern itself, for Government is strong, it possesses ample powers to put down a rebellion, it may defeat the revolution with ease needs no answer. For that is not the question. Certainly an attempt to overthrow the Government by force, even though doomed from the outset because of inadequate numbers or power of the revolutionists, is a sufficient evil for Congress to prevent. The damage which such attempts create both physically and politically to a nation makes it impossible to measure the validity in terms of the probability of success, or the immediacy of a successful attempt. In the instant case the trial judge charged the jury that they could not convict unless they found that petitioners intended to overthrow the Gov-

510

ernment "as speedily as circumstances would permit." This does not mean, and could not properly mean, that they would not strike until there was certainty of success. What was meant was that the revolutionists would strike when they thought the time was ripe. We must therefore reject the contention that success or probability of success is the criterion.

The situation with which Justices Holmes and Brandeis were concerned in *Gitlow* was a comparatively isolated event, bearing little relation in their minds to any substantial threat to the safety of the community. Such also is true of cases like *Fiske* v. *Kansas*, 274 U. S. 380 (1927), and *De Jonge* v. *Oregon*, 299 U. S. 353 (1937); but cf. *Lazar* v. *Pennsylvania*, 286 U. S. 532 (1932). They were not confronted with any situation comparable to the instant one—the development of an apparatus designed and dedicated to the overthrow of the Government, in the context of world crisis after crisis.

Chief Judge Learned Hand, writing for the majority below, interpreted the phrase as follows: "In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." 183 F. 2d at 212. We adopt this statement of the rule. As articulated by Chief Judge Hand, it is as succinct and inclusive as any other we might devise at this time. It takes into consideration those factors which we deem relevant, and relates their significances. More we cannot expect from words.

Likewise, we are in accord with the court below, which affirmed the trial court's finding that the requisite danger existed. The mere fact that from the period 1945 to 1948 petitioners' activities did not result in an attempt to overthrow the Government by force and violence is of course no answer to the fact that there was a group that was ready to make the attempt. The formation

by petitioners of such a highly organized conspiracy, with rigidly disciplined members subject to call when the leaders, these petitioners, felt that the time had come for action, coupled with the inflammable nature of world conditions, similar uprisings in other countries, and the touch-and-go nature of our relations with countries with whom petitioners were in the very least ideologically attuned, convince us that their convictions were justified on this score. And this analysis disposes of the contention that a conspiracy to advocate, as distinguished from the advocacy itself, cannot be constitutionally restrained, because it comprises only the preparation. It is the existence of the conspiracy which creates the danger. Cf. *Pinkerton* v. *United States,* 328 U. S. 640 (1946); *Goldman* v. *United States,* 245 U. S. 474 (1918); *United States* v. *Rabinowich,* 238 U. S. 78 (1915). If the ingredients of the reaction are present, we cannot bind the Government to wait until the catalyst is added.

## IV.

Although we have concluded that the finding that there was a sufficient danger to warrant the application of the statute was justified on the merits, there remains the problem of whether the trial judge's treatment of the issue was correct. He charged the jury, in relevant part, as follows:

> "In further construction and interpretation of the statute I charge you that it is not the abstract doctrine of overthrowing or destroying organized government by unlawful means which is denounced by this law, but the teaching and advocacy of action for the accomplishment of that purpose, by language reasonably and ordinarily calculated to incite persons to such action. Accordingly, you cannot find the defendants or any of them guilty of the crime charged

unless you are satisfied beyond a reasonable doubt that they conspired to organize a society, group and assembly of persons who teach and advocate the overthrow or destruction of the Government of the United States by force and violence and to advocate and teach the duty and necessity of overthrowing or destroying the Government of the United States by force and violence, with the intent that such teaching and advocacy be of a rule or principle of action and by language reasonably and ordinarily calculated to incite persons to such action, all with the intent to cause the overthrow or destruction of the Government of the United States by force and violence as speedily as circumstances would permit.

. . . . .

"If you are satisfied that the evidence establishes beyond a reasonable doubt that the defendants, or any of them, are guilty of a violation of the statute, as I have interpreted it to you, I find as matter of law that there is sufficient danger of a substantive evil that the Congress has a right to prevent to justify the application of the statute under the First Amendment of the Constitution.

"This is matter of law about which you have no concern. It is a finding on a matter of law which I deem essential to support my ruling that the case should be submitted to you to pass upon the guilt or innocence of the defendants. . . ."

It is thus clear that he reserved the question of the existence of the danger for his own determination, and the question becomes whether the issue is of such a nature that it should have been submitted to the jury.

The first paragraph of the quoted instructions calls for the jury to find the facts essential to establish the substantive crime, violation of §§ 2 (a) (1) and 2 (a) (3) of

the Smith Act, involved in the conspiracy charge. There can be no doubt that if the jury found those facts against the petitioners violation of the Act would be established. The argument that the action of the trial court is erroneous, in declaring as a matter of law that such violation shows sufficient danger to justify the punishment despite the First Amendment, rests on the theory that a jury must decide a question of the application of the First Amendment. We do not agree.

When facts are found that establish the violation of a statute, the protection against conviction afforded by the First Amendment is a matter of law. The doctrine that there must be a clear and present danger of a substantive evil that Congress has a right to prevent is a judicial rule to be applied as a matter of law by the courts. The guilt is established by proof of facts. Whether the First Amendment protects the activity which constitutes the violation of the statute must depend upon a judicial determination of the scope of the First Amendment applied to the circumstances of the case.

Petitioners' reliance upon Justice Brandeis' language in his concurrence in *Whitney, supra,* is misplaced. In that case Justice Brandeis pointed out that the defendant could have made the existence of the requisite danger the important issue at her trial, but that she had not done so. In discussing this failure, he stated that the defendant could have had the issue determined by the court *or* the jury.[6] No realistic construction of this disjunctive lan-

---

[6] "Whether in 1919, when Miss Whitney did the things complained of, there was in California such clear and present danger of serious evil, might have been made the important issue in the case. She might have required that the issue be determined either by the *court or the jury*. She claimed below that the statute as applied to her violated the Federal Constitution; but she did not claim that it was void because there was no clear and present danger of serious evil, nor did she request that the existence of these conditions of a valid

guage could arrive at the conclusion that he intended to state that the question was *only* determinable by a jury. Nor is the incidental statement of the majority in *Pierce, supra,* of any more persuasive effect.[7] There the issue of the probable effect of the publication had been submitted to the jury, and the majority was apparently addressing its remarks to the contention of the dissenters that the jury could not reasonably have returned a verdict of guilty on the evidence.[8] Indeed, in the very case in which the phrase was born, *Schenck,* this Court itself examined the record to find whether the requisite danger appeared, and the issue was not submitted to a jury. And in every later case in which the Court has measured the validity of a statute by the "clear and present danger" test, that determination has been by the court, the question of the danger not being submitted to the jury.

The question in this case is whether the statute which the legislature has enacted may be constitutionally applied. In other words, the Court must examine judicially

---

measure thus restricting the rights of free speech and assembly be passed upon by *the court or a jury.* On the other hand, there was evidence on which *the court or jury* might have found that such danger existed." (Emphasis added.) 274 U. S. at 379.

[7] "Whether the printed words would in fact produce as a proximate result a material interference with the recruiting or enlistment service, or the operation or success of the forces of the United States, was a question for the jury to decide in view of all the circumstances of the time and considering the place and manner of distribution." 252 U. S. 239, 250 (1920).

[8] A similarly worded expression is found in that part of the majority opinion sustaining the overruling of the defendants' general demurrer to the indictment. 252 U. S. at 244. Since the defendants had not raised the issue of "clear and present danger" at the trial, it is clear that the Court was not faced with the question whether the trial judge erred in not determining, as a conclusive matter, the existence or nonexistence of a "clear and present danger." The only issue to which the remarks were addressed was whether the indictment sufficiently alleged the violation.

the application of the statute to the particular situation, to ascertain if the Constitution prohibits the conviction. We hold that the statute may be applied where there is a "clear and present danger" of the substantive evil which the legislature had the right to prevent. Bearing, as it does, the marks of a "question of law," the issue is properly one for the judge to decide.

## V.

There remains to be discussed the question of vagueness—whether the statute as we have interpreted it is too vague, not sufficiently advising those who would speak of the limitations upon their activity. It is urged that such vagueness contravenes the First and Fifth Amendments. This argument is particularly nonpersuasive when presented by petitioners, who, the jury found, intended to overthrow the Government as speedily as circumstances would permit. See *Abrams* v. *United States,* 250 U. S. 616, 627–629 (1919) (dissenting opinion); *Whitney* v. *California,* 274 U. S. 357, 373 (1927) (concurring opinion); *Taylor* v. *Mississippi,* 319 U. S. 583, 589 (1943). A claim of guilelessness ill becomes those with evil intent. *Williams* v. *United States,* 341 U. S. 97, 101–102 (1951); *Jordan* v. *De George,* 341 U. S. 223, 230–232 (1951); *American Communications Assn.* v. *Douds,* 339 U. S. at 413; *Screws* v. *United States,* 325 U. S. 91, 101 (1945).

We agree that the standard as defined is not a neat, mathematical formulary. Like all verbalizations it is subject to criticism on the score of indefiniteness. But petitioners themselves contend that the verbalization "clear and present danger" is the proper standard. We see no difference, from the standpoint of vagueness, whether the standard of "clear and present danger" is one contained *in haec verba* within the statute, or whether it is the judicial measure of constitutional applicability. We

have shown the indeterminate standard the phrase necessarily connotes. We do not think we have rendered that standard any more indefinite by our attempt to sum up the factors which are included within its scope. We think it well serves to indicate to those who would advocate constitutionally prohibited conduct that there is a line beyond which they may not go—a line which they, in full knowledge of what they intend and the circumstances in which their activity takes place, will well appreciate and understand. *Williams, supra,* at 101–102; *Jordan, supra,* at 230–232; *United States* v. *Petrillo,* 332 U. S. 1, 7 (1948); *United States* v. *Wurzbach,* 280 U. S. 396, 399 (1930); *Nash* v. *United States,* 229 U. S. 373, 376–377 (1913). Where there is doubt as to the intent of the defendants, the nature of their activities, or their power to bring about the evil, this Court will review the convictions with the scrupulous care demanded by our Constitution. But we are not convinced that because there may be borderline cases at some time in the future, these convictions should be reversed because of the argument that these petitioners could not know that their activities were constitutionally proscribed by the statute.

We have not discussed many of the questions which could be extracted from the record, although they were treated in detail by the court below. Our limited grant of the writ of certiorari has withdrawn from our consideration at this date those questions, which include, *inter alia,* sufficiency of the evidence, composition of jury, and conduct of the trial.

We hold that §§ 2 (a) (1), 2 (a) (3) and 3 of the Smith Act do not inherently, or as construed or applied in the instant case, violate the First Amendment and other provisions of the Bill of Rights, or the First and Fifth Amendments because of indefiniteness. Petitioners intended to overthrow the Government of the United States as speedily as the circumstances would permit. Their conspiracy

to organize the Communist Party and to teach and advocate the overthrow of the Government of the United States by force and violence created a "clear and present danger" of an attempt to overthrow the Government by force and violence. They were properly and constitutionally convicted for violation of the Smith Act. The judgments of conviction are

*Affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring in affirmance of the judgment.

The defendants were convicted under § 3 of the Smith Act for conspiring to violate § 2 of that Act, which makes it unlawful "to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence." Act of June 28, 1940, § 2 (a) (3), 54 Stat. 670, 671, 18 U. S. C. § 10, now 18 U. S. C. § 2385. The substance of the indictment is that the defendants between April 1, 1945, and July 20, 1948, agreed to bring about the dissolution of a body known as the Communist Political Association and to organize in its place the Communist Party of the United States; that the aim of the new party was "the overthrow and destruction of the Government of the United States by force and violence"; that the defendants were to assume leadership of the Party and to recruit members for it and that the Party was to publish books and conduct classes, teaching the duty and the necessity of forceful overthrow. The jury found all the defendants guilty. With one exception, each was sentenced to imprisonment for five years and to a fine of $10,000. The convictions were affirmed by the Court of Appeals for the Second

Circuit. 183 F. 2d 201. We were asked to review this affirmance on all the grounds considered by the Court of Appeals. These included not only the scope of the freedom of speech guaranteed by the Constitution, but also serious questions regarding the legal composition of the jury and the fair conduct of the trial. We granted certiorari, strictly limited, however, to the contention that §§ 2 and 3 of the Smith Act, inherently and as applied, violated the First and Fifth Amendments. 340 U. S. 863. No attempt was made to seek an enlargement of the range of questions thus defined, and these alone are now open for our consideration. All others are foreclosed by the decision of the Court of Appeals.

As thus limited, the controversy in this Court turns essentially on the instructions given to the jury for determining guilt or innocence. 9 F. R. D. 367. The first question is whether—wholly apart from constitutional matters—the judge's charge properly explained to the jury what it is that the Smith Act condemns. The conclusion that he did so requires no labored argument. On the basis of the instructions, the jury found, for the purpose of our review, that the advocacy which the defendants conspired to promote was to be a rule of action, by language reasonably calculated to incite persons to such action, and was intended to cause the overthrow of the Government by force and violence as soon as circumstances permit. This brings us to the ultimate issue. In enacting a statute which makes it a crime for the defendants to conspire to do what they have been found to have conspired to do, did Congress exceed its constitutional power?

Few questions of comparable import have come before this Court in recent years. The appellants maintain that they have a right to advocate a political theory, so long, at least, as their advocacy does not create an immediate danger of obvious magnitude to the very existence of

our present scheme of society.   On the other hand, the Government asserts the right to safeguard the security of the Nation by such a measure as the Smith Act.   Our judgment is thus solicited on a conflict of interests of the utmost concern to the well-being of the country.   This conflict of interests cannot be resolved by a dogmatic preference for one or the other, nor by a sonorous formula which is in fact only a euphemistic disguise for an unresolved conflict.   If adjudication is to be a rational process, we cannot escape a candid examination of the conflicting claims with full recognition that both are supported by weighty title-deeds.

## I.

There come occasions in law, as elsewhere, when the familiar needs to be recalled.   Our whole history proves even more decisively than the course of decisions in this Court that the United States has the powers inseparable from a sovereign nation.   "America has chosen to be, in many respects, and to many purposes, a nation; and for all these purposes, her government is complete; to all these objects, it is competent."   Chief Justice Marshall in *Cohens* v. *Virginia,* 6 Wheat. 264, 414.   The right of a government to maintain its existence—self-preservation— is the most pervasive aspect of sovereignty.   "Security against foreign danger," wrote Madison, "is one of the primitive objects of civil society."   The Federalist, No. 41.   The constitutional power to act upon this basic principle has been recognized by this Court at different periods and under diverse circumstances.   "To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated.   It matters not in what form such aggression and encroachment come . . . .   The government, possessing the powers which are to be exercised

for protection and security, is clothed with authority to determine the occasion on which the powers shall be called forth . . . ." *Chinese Exclusion Case,* 130 U. S. 581, 606. See also *De Lima* v. *Bidwell,* 182 U. S. 1; *Mackenzie* v. *Hare,* 239 U. S. 299; *Missouri* v. *Holland,* 252 U. S. 416; *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304. The most tragic experience in our history is a poignant reminder that the Nation's continued existence may be threatened from within. To protect itself from such threats, the Federal Government "is invested with all those inherent and implied powers which, at the time of adopting the Constitution, were generally considered to belong to every government as such, and as being essential to the exercise of its functions." Mr. Justice Bradley, concurring in *Legal Tender Cases,* 12 Wall. 457, 554, 556; and see *In re Debs,* 158 U. S. 564, 582.

But even the all-embracing power and duty of self-preservation are not absolute. Like the war power, which is indeed an aspect of the power of self-preservation, it is subject to applicable constitutional limitations. See *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 156. Our Constitution has no provision lifting restrictions upon governmental authority during periods of emergency, although the scope of a restriction may depend on the circumstances in which it is invoked.

The First Amendment is such a restriction. It exacts obedience even during periods of war; it is applicable when war clouds are not figments of the imagination no less than when they are. The First Amendment categorically demands that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The right of a man to think what he

pleases, to write what he thinks, and to have his thoughts made available for others to hear or read has an engaging ring of universality. The Smith Act and this conviction under it no doubt restrict the exercise of free speech and assembly. Does that, without more, dispose of the matter?

Just as there are those who regard as invulnerable every measure for which the claim of national survival is invoked, there are those who find in the Constitution a wholly unfettered right of expression. Such literalness treats the words of the Constitution as though they were found on a piece of outworn parchment instead of being words that have called into being a nation with a past to be preserved for the future. The soil in which the Bill of Rights grew was not a soil of arid pedantry. The historic antecedents of the First Amendment preclude the notion that its purpose was to give unqualified immunity to every expression that touched on matters within the range of political interest. The Massachusetts Constitution of 1780 guaranteed free speech; yet there are records of at least three convictions for political libels obtained between 1799 and 1803.[1] The Pennsylvania Constitution of 1790 and the Delaware Constitution of 1792 expressly imposed liability for abuse of the right of free speech.[2] Madison's own State put on its books in 1792 a statute confining the abusive exercise of the right of utterance.[3] And it deserves to be noted that in writing to John Adams's wife, Jefferson did not rest his condemnation of the Sedition Act of 1798 on his belief in

---

[1] Mass. Const., 1780, Part I, Art. XVI. See Duniway, Freedom of the Press in Massachusetts, 144–146.

[2] Pa. Const., 1790, Art. IX, § 7; Del. Const., 1792, Art. I, § 5.

[3] The General Assembly of Virginia passed a statute on December 26, 1792, directed at establishment of "any government separate from, or independent of the government of *Virginia*, within the limits thereof, unless by act of the legislature of this commonwealth for that

unrestrained utterance as to political matter. The First Amendment, he argued, reflected a limitation upon Federal power, leaving the right to enforce restrictions on speech to the States.[4]

purpose first obtained." The statute provided that "EVERY person . . . who shall by writing or advised speaking, endeavour to instigate the people of this commonwealth to erect or establish such government without such assent as aforesaid, shall be adjudged guilty of a high crime and misdemeanor . . . ." Va. Code, 1803, c. CXXXVI.

[4] In a letter to Abigail Adams, dated September 11, 1804, Jefferson said with reference to the Sedition Act:

"Nor does the opinion of the unconstitutionality and consequent nullity of that law remove all restraint from the overwhelming torrent of slander which is confounding all vice and virtue, all truth and falsehood in the US. The power to do that is fully possessed by the several state legislatures. It was reserved to them, and was denied to the general government, by the constitution according to our construction of it. While we deny that Congress have a right to controul the freedom of the press, we have ever asserted the right of the states, and their exclusive right, to do so."

The letter will be published in a forthcoming volume of The Papers of Thomas Jefferson (Boyd ed.), to which I am indebted for its reproduction here in its exact form.

The Sedition Act of July 14, 1798, was directed at two types of conduct. Section 1 made it a criminal offense to conspire "to impede the operation of any law of the United States," and to "counsel, advise or attempt to procure any insurrection, riot, unlawful assembly, or combination." Section 2 provided:

"That if any person shall write, print, utter or publish, or shall cause or procure to be written, printed, uttered or published, or shall knowingly and willingly assist or aid in writing, printing, uttering or publishing any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress of the United States, or the President of the United States, with intent to defame the said government, or either house of the said Congress, or the said President, or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States, or to stir up sedition within the United States, or to excite any unlawful combinations therein, for opposing or resisting any law of the United

The language of the First Amendment is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the presuppositions of those who employed them. Not what words did Madison and Hamilton use, but what was it in their minds which they conveyed? Free speech is subject to prohibition of those abuses of expression which a civilized society may forbid. As in the case of every other provision of the Constitution that is not crystallized by the nature of its technical concepts, the fact that the First Amendment is not self-defining and self-enforcing neither impairs its usefulness nor compels its paralysis as a living instrument.

---

States, or any act of the President of the United States, done in pursuance of any such law, or of the powers in him vested by the constitution of the United States, or to resist, oppose, or defeat any such law or act, or to aid, encourage or abet any hostile designs of any foreign nation against the United States, their people or government, then such person, being thereof convicted before any court of the United States having jurisdiction thereof, shall be punished by a fine not exceeding two thousand dollars, and by imprisonment not exceeding two years." 1 Stat. 596–597.

No substantial objection was raised to § 1 of the Act. The argument against the validity of § 2 is stated most fully in the Virginia Report of 1799–1800. That Report, prepared for the House of Delegates by a committee of which Madison was chairman, attempted to establish that the power to regulate speech was not delegated to the Federal Government by the Constitution, and that the First Amendment had prohibited the National Government from exercising the power. In reply it was urged that power to restrict seditious writing was implicit in the acknowledged power of the Federal Government to prohibit seditious acts, and that the liberty of the press did not extend to the sort of speech restricted by the Act. See the Report of the Committee of the House of Representatives to which were referred memorials from the States, H. R. Rep. No. 110, 5th Cong., 3d Sess., published in American State Papers, Misc. Vol. 1, p. 181. For an extensive contemporary account of the controversy, see St. George Tucker's 1803 edition of Blackstone's Commentaries, Appendix to Vol. First, Part Second, Note G.

"The law is perfectly well settled," this Court said over fifty years ago, "that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case. In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." *Robertson* v. *Baldwin,* 165 U. S. 275, 281. That this represents the authentic view of the Bill of Rights and the spirit in which it must be construed has been recognized again and again in cases that have come here within the last fifty years. See, *e. g., Gompers* v. *United States,* 233 U. S. 604, 610. Absolute rules would inevitably lead to absolute exceptions, and such exceptions would eventually corrode the rules.[5] The demands of free speech in a democratic society as well as the interest

[5] Professor Alexander Meiklejohn is a leading exponent of the absolutist interpretation of the First Amendment. Recognizing that certain forms of speech require regulation, he excludes those forms of expression entirely from the protection accorded by the Amendment. "The constitutional status of a merchant advertising his wares, of a paid lobbyist fighting for the advantage of his client, is utterly different from that of a citizen who is planning for the general welfare." Meiklejohn, Free Speech, 39. "The radio as it now operates among us is not free. Nor is it entitled to the protection of the First Amendment. It is not engaged in the task of enlarging and enriching human communication. It is engaged in making money." *Id.* at 104. Professor Meiklejohn even suggests that scholarship may now require such subvention and control that it no longer is entitled to protection by the First Amendment. See *id.* at 99–100. Professor Chafee in his review of the Meiklejohn book, 62 Harv. L. Rev. 891, has subjected this position to trenchant comment.

in national security are better served by candid and informed weighing of the competing interests, within the confines of the judicial process, than by announcing dogmas too inflexible for the non-Euclidian problems to be solved.

But how are competing interests to be assessed? Since they are not subject to quantitative ascertainment, the issue necessarily resolves itself into asking, who is to make the adjustment?—who is to balance the relevant factors and ascertain which interest is in the circumstances to prevail? Full responsibility for the choice cannot be given to the courts. Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

Primary responsibility for adjusting the interests which compete in the situation before us of necessity belongs to the Congress. The nature of the power to be exercised by this Court has been delineated in decisions not charged with the emotional appeal of situations such as that now before us. We are to set aside the judgment of those whose duty it is to legislate only if there is no reasonable basis for it. *Sinking-Fund Cases,* 99 U. S. 700, 718; *Mugler* v. *Kansas,* 123 U. S. 623, 660–661; *United States* v. *Carolene Products Co.,* 304 U. S. 144. We are to determine whether a statute is sufficiently definite to meet the constitutional requirements of due process, and whether it respects the safeguards against undue concentration of authority secured by separation of power. *United States* v. *Cohen Grocery Co.,* 255 U. S. 81.

We must assure fairness of procedure, allowing full scope to governmental discretion but mindful of its impact on individuals in the context of the problem involved. *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123. And, of course, the proceedings in a particular case before us must have the warrant of substantial proof. Beyond these powers we must not go; we must scrupulously observe the narrow limits of judicial authority even though self-restraint is alone set over us. Above all we must remember that this Court's power of judicial review is not "an exercise of the powers of a super-legislature." Mr. Justice Brandeis and Mr. Justice Holmes, dissenting in *Burns Baking Co.* v. *Bryan,* 264 U. S. 504, 534.

A generation ago this distribution of responsibility would not have been questioned. See *Fox* v. *Washington,* 236 U. S. 273; *Meyer* v. *Nebraska,* 262 U. S. 390; *Bartels* v. *Iowa,* 262 U. S. 404; cf. *New York ex rel. Bryant* v. *Zimmerman,* 278 U. S. 63. But in recent decisions we have made explicit what has long been implicitly recognized. In reviewing statutes which restrict freedoms protected by the First Amendment, we have emphasized the close relation which those freedoms bear to maintenance of a free society. See *Kovacs* v. *Cooper,* 336 U. S. 77, 89, 95 (concurring). Some members of the Court—and at times a majority—have done more. They have suggested that our function in reviewing statutes restricting freedom of expression differs sharply from our normal duty in sitting in judgment on legislation. It has been said that such statutes "must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice." *Thomas* v. *Collins,* 323 U. S. 516, 530. It has been suggested, with the casualness of a footnote, that such legislation is not

presumptively valid, see *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4, and it has been weightily reiterated that freedom of speech has a "preferred position" among constitutional safeguards. *Kovacs* v. *Cooper,* 336 U. S. 77, 88.

The precise meaning intended to be conveyed by these phrases need not now be pursued. It is enough to note that they have recurred in the Court's opinions, and their cumulative force has, not without justification, engendered belief that there is a constitutional principle, expressed by those attractive but imprecise words, prohibiting restriction upon utterance unless it creates a situation of "imminent" peril against which legislation may guard.[6] It is on this body of the Court's pronouncements that the defendants' argument here is based.

In all fairness, the argument cannot be met by reinterpreting the Court's frequent use of "clear" and "present" to mean an entertainable "probability." In giving this meaning to the phrase "clear and present danger," the Court of Appeals was fastidiously confining the rhetoric of opinions to the exact scope of what was decided by them. We have greater responsibility for having given constitutional support, over repeated protests, to uncritical libertarian generalities.

---

[6] In *Hartzel* v. *United States,* 322 U. S. 680, 687, the Court reversed a conviction for wilfully causing insubordination in the military forces on the ground that the intent required by the statute was not shown. It added that there was a second element necessary to conviction, "consisting of a clear and present danger that the activities in question will bring about the substantive evils which Congress has a right to prevent. *Schenck* v. *United States,* 249 U. S. 47. Both elements must be proved by the Government beyond a reasonable doubt."

Other passages responsible for attributing to the Court the principle that imminence of the apprehended evil is necessary to conviction in free-speech cases are collected in an Appendix to this opinion, *post,* p. 556.

Nor is the argument of the defendants adequately met by citing isolated cases. Adjustment of clash of interests which are at once subtle and fundamental is not likely to reveal entire consistency in a series of instances presenting the clash. It is not too difficult to find what one seeks in the language of decisions reporting the effort to reconcile free speech with the interests with which it conflicts. The case for the defendants requires that their conviction be tested against the entire body of our relevant decisions. Since the significance of every expression of thought derives from the circumstances evoking it, results reached rather than language employed give the vital meaning. See *Cohens* v. *Virginia,* 6 Wheat. 264, 442; Wambaugh, The Study of Cases, 10.

There is an added reason why we must turn to the decisions. "Great cases," it is appropriate to remember, "like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." Mr. Justice Holmes, dissenting in *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400–401.

This is such a case. Unless we are to compromise judicial impartiality and subject these defendants to the risk of an *ad hoc* judgment influenced by the impregnating atmosphere of the times, the constitutionality of their conviction must be determined by principles established in cases decided in more tranquil periods. If those decisions are to be used as a guide and not as an argument, it is important to view them as a whole and to distrust the easy generalizations to which some of them lend themselves.

## II.

We have recognized and resolved conflicts between speech and competing interests in six different types of cases.[7]

1. The cases involving a conflict between the interest in allowing free expression of ideas in public places and the interest in protection of the public peace and the primary uses of streets and parks, were too recently considered to be rehearsed here. *Niemotko* v. *Maryland,* 340 U. S. 268, 273. It suffices to recall that the result in each case was found to turn on the character of the interest with which the speech clashed, the method used to impose the restriction, and the nature and circumstances of the utterance prohibited. While the decisions recognized the importance of free speech and carefully scrutinized the justification for its regulation, they rejected the notion that vindication of the deep public interest in freedom of expression requires subordination of all conflicting values.

2. A critique of the cases testing restrictions on picketing is made more difficult by the inadequate recognition by the Court from the outset that the loyalties and responses evoked and exacted by picket lines differentiate this form of expression from other modes of communication. See *Thornhill* v. *Alabama,* 310 U. S. 88. But the

---

[7] No useful purpose would be served by considering here decisions in which the Court treated the challenged regulation as though it imposed no real restraint on speech or on the press. *E. g., Associated Press* v. *Labor Board,* 301 U. S. 103; *Valentine* v. *Chrestensen,* 316 U. S. 52; *Railway Express Agency* v. *New York,* 336 U. S. 106; *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288. We recognized that restrictions on speech were involved in *United States ex rel. Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407, and *Gilbert* v. *Minnesota,* 254 U. S. 325; but the decisions raised issues so different from those presented here that they too need not be considered in detail. Our decisions in *Stromberg* v. *California,* 283 U. S. 359, and *Winters* v. *New York,* 333 U. S. 507, turned on the indefiniteness of the statutes.

crux of the decision in the *Thornhill* case was that a State could not constitutionally punish peaceful picketing when neither the aim of the picketing nor the manner in which it was carried out conflicted with a substantial interest. In subsequent decisions we sustained restrictions designed to prevent recurrence of violence, *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, or reasonably to limit the area of industrial strife, *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U. S. 722; cf. *Bakery & Pastry Drivers Local* v. *Wohl,* 315 U. S. 769. We held that a State's policy against restraints of trade justified it in prohibiting picketing which violated that policy, *Giboney* v. *Empire Storage Co.,* 336 U. S. 490; we sustained restrictions designed to encourage self-employed persons, *International Brotherhood of Teamsters Union* v. *Hanke,* 339 U. S. 470; and to prevent racial discrimination, *Hughes* v. *Superior Court,* 339 U. S. 460. The Fourteenth Amendment bars a State from prohibiting picketing when there is no fair justification for the breadth of the restriction imposed. *American Federation of Labor* v. *Swing,* 312 U. S. 321; *Cafeteria Employees Union* v. *Angelos,* 320 U. S. 293. But it does not prevent a State from denying the means of communication that picketing affords in a fair balance between the interests of trade unionism and other interests of the community.

3. In three cases we have considered the scope and application of the power of the Government to exclude, deport, or denaturalize aliens because of their advocacy or their beliefs. In *United States ex rel. Turner* v. *Williams,* 194 U. S. 279, we held that the First Amendment did not disable Congress from directing the exclusion of an alien found in an administrative proceeding to be an anarchist. "[A]s long as human governments endure," we said, "they cannot be denied the power of self-preservation, as that question is presented here."

194 U. S. at 294. In *Schneiderman* v. *United States,* 320 U. S. 118, and *Bridges* v. *Wixon,* 326 U. S. 135, we did not consider the extent of the power of Congress. In each case, by a closely divided Court, we interpreted a statute authorizing denaturalization or deportation to impose on the Government the strictest standards of proof.

4. History regards "freedom of the press" as indispensable for a free society and for its government. We have, therefore, invalidated discriminatory taxation against the press and prior restraints on publication of defamatory matter. *Grosjean* v. *American Press Co.,* 297 U. S. 233; *Near* v. *Minnesota,* 283 U. S. 697.

We have also given clear indication of the importance we attach to dissemination of ideas in reviewing the attempts of States to reconcile freedom of the press with protection of the integrity of the judicial process. In *Pennekamp* v. *Florida,* 328 U. S. 331, the Court agreed that the Fourteenth Amendment barred a State from adjudging in contempt of court the publisher of critical and inaccurate comment about portions of a litigation that for all practical purposes were no longer pending. We likewise agreed, in a minor phase of our decision in *Bridges* v. *California,* 314 U. S. 252, that even when statements in the press relate to matters still pending before a court, convictions for their publication cannot be sustained if their utterance is too trivial to be deemed a substantial threat to the impartial administration of justice.

The Court has, however, sharply divided on what constitutes a sufficient interference with the course of justice. In the first decision, *Patterson* v. *Colorado,* 205 U. S. 454, the Court affirmed a judgment for contempt imposed by a State supreme court for publication of articles reflecting on the conduct of the court in cases still before it on

motions for rehearing. In the *Bridges* case, however, a majority held that a State court could not protect itself from the implied threat of a powerful newspaper that failure of an elected judge to impose a severe sentence would be a "serious mistake." The same case also placed beyond a State's power to punish the publication of a telegram from the president of an important union who threatened a damaging strike in the event of an adverse decision. The majority in *Craig* v. *Harney*, 331 U. S. 367, 376, held that the Fourteenth Amendment protected "strong," "intemperate," "unfair" criticism of the way an elected lay judge was conducting a pending civil case. None of the cases establishes that the public interest in a free press must in all instances prevail over the public interest in dispassionate adjudication. But the *Bridges* and *Craig* decisions, if they survive, tend to require a showing that interference be so imminent and so demonstrable that the power theoretically possessed by the State is largely paralyzed.

5. Our decision in *American Communications Assn.* v. *Douds*, 339 U. S. 382, recognized that the exercise of political rights protected by the First Amendment was necessarily discouraged by the requirement of the Taft-Hartley Act that officers of unions employing the services of the National Labor Relations Board sign affidavits that they are not Communists. But we held that the statute was not for this reason presumptively invalid. The problem, we said, was "one of weighing the probable effects of the statute upon the free exercise of the right of speech and assembly against the congressional determination that political strikes are evils of conduct which cause substantial harm to interstate commerce and that Communists and others identified by § 9 (h) pose continuing threats to that public interest when in positions of union leader-

ship." 339 U. S. at 400. On balance, we decided that the legislative judgment was a permissible one.[8]

6. Statutes prohibiting speech because of its tendency to lead to crime present a conflict of interests which bears directly on the problem now before us. The first case in which we considered this conflict was *Fox* v. *Washington, supra.* The statute there challenged had been interpreted to prohibit publication of matter "encouraging an actual breach of law." We held that the Fourteenth Amendment did not prohibit application of the statute to an article which we concluded incited a breach of laws against indecent exposure. We said that the statute "lays hold of encouragements that, apart from statute, if directed to a particular person's conduct, generally would make him who uttered them guilty of a misdemeanor if not an accomplice or a principal in the crime encouraged, and deals with the publication of them to a wider and less selected audience." 236 U. S. at 277–278. To be sure, the *Fox* case preceded the explicit absorption of the substance of the First Amendment in the Fourteenth. But subsequent decisions extended the *Fox* principle to free-speech situations. They are so important to the problem before us that we must consider them in detail.

(a) The first important application of the principle was made in six cases arising under the Espionage Act of 1917. That Act prohibits conspiracies and attempts

---

[8] The Taft-Hartley Act also requires that an officer of a union using the services of the National Labor Relations Board take oath that he "does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods." The Court divided on the validity of this requirement. Test oaths raise such special problems that decisions on their validity are not directly helpful here. See *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624.

to "obstruct the recruiting or enlistment service." In each of the first three cases, Mr. Justice Holmes wrote for a unanimous Court, affirming the convictions. The evidence in *Schenck* v. *United States,* 249 U. S. 47, showed that the defendant had conspired to circulate among men called for the draft 15,000 copies of a circular which asserted a "right" to oppose the draft. The defendant in *Frohwerk* v. *United States,* 249 U. S. 204, was shown to have conspired to publish in a newspaper twelve articles describing the sufferings of American troops and the futility of our war aims. The record was inadequate, and we said that it was therefore "impossible to say that it might not have been found that the circulation of the paper was in quarters where a little breath would be enough to kindle a flame and that the fact was known and relied upon by those who sent the paper out." 249 U. S. at 209. In *Debs* v. *United States,* 249 U. S. 211, the indictment charged that the defendant had delivered a public speech expounding socialism and praising Socialists who had been convicted of abetting violation of the draft laws.

The ground of decision in each case was the same. The First Amendment "cannot have been, and obviously was not, intended to give immunity for every possible use of language. *Robertson* v. *Baldwin,* 165 U. S. 275, 281." *Frohwerk* v. *United States, supra,* at 206. "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." *Schenck* v. *United States, supra,* at 52. When "the words used had as their natural tendency and reasonably probable effect to obstruct the recruiting service," and "the defendant had the specific intent to do so in his mind," conviction in wartime is not prohibited by the Constitution. *Debs* v. *United States, supra,* at 216.

In the three succeeding cases Holmes and Brandeis, JJ., dissented from judgments of the Court affirming convictions. The indictment in *Abrams* v. *United States,* 250 U. S. 616, was laid under an amendment to the Espionage Act which prohibited conspiracies to advocate curtailment of production of material necessary to prosecution of the war, with the intent thereby to hinder the United States in the prosecution of the war. It appeared that the defendants were anarchists who had printed circulars and distributed them in New York City. The leaflets repeated standard Marxist slogans, condemned American intervention in Russia, and called for a general strike in protest. In *Schaefer* v. *United States,* 251 U. S. 466, the editors of a German-language newspaper in Philadelphia were charged with obstructing the recruiting service and with wilfully publishing false reports with the intent to promote the success of the enemies of the United States. The evidence showed publication of articles which accused American troops of weakness and mendacity and in one instance misquoted or mistranslated two words of a Senator's speech. The indictment in *Pierce* v. *United States,* 252 U. S. 239, charged that the defendants had attempted to cause insubordination in the armed forces and had conveyed false reports with intent to interfere with military operations. Conviction was based on circulation of a pamphlet which belittled Allied war aims and criticized conscription in strong terms.

In each case both the majority and the dissenting opinions relied on *Schenck* v. *United States.* The Court divided on its view of the evidence. The majority held that the jury could infer the required intent and the probable effect of the articles from their content. Holmes and Brandeis, JJ., thought that only "expressions of opinion and exhortations," 250 U. S. at 631, were involved, that they were "puny anonymities," 250 U. S. at 629, "impotent to produce the evil against which the statute aimed," 251

U. S. 493, and that from them the specific intent required by the statute could not reasonably be inferred. The Court agreed that an incitement to disobey the draft statute could constitutionally be punished. It disagreed over the proof required to show such an incitement.

(b) In the eyes of a majority of the Court, *Gitlow* v. *New York,* 268 U. S. 652, presented a very different problem. There the defendant had been convicted under a New York statute nearly identical with the Smith Act now before us. The evidence showed that the defendant was an official of the Left Wing Section of the Socialist Party, and that he was responsible for publication of a Left Wing Manifesto. This document repudiated "moderate Socialism," and urged the necessity of a militant "revolutionary Socialism," based on class struggle and revolutionary mass action. No evidence of the effect of the Manifesto was introduced; but the jury were instructed that they could not convict unless they found that the document advocated employing unlawful acts for the purpose of overthrowing organized government.

The conviction was affirmed. The question, the Court held, was entirely different from that involved in *Schenck* v. *United States,* where the statute prohibited acts without reference to language. Here, where "the legislative body has determined generally, in the constitutional exercise of its discretion, that utterances of a certain kind involve such danger of substantive evil that they may be punished, the question whether any specific utterance coming within the prohibited class is likely, in and of itself, to bring about the substantive evil, is not open to consideration." 268 U. S. at 670. It is sufficient that the defendant's conduct falls within the statute, and that the statute is a reasonable exercise of legislative judgment.

This principle was also applied in *Whitney* v. *California,* 274 U. S. 357, to sustain a conviction under a State criminal syndicalism statute. That statute made it a

felony to assist in organizing a group assembled to advocate the commission of crime, sabotage, or unlawful acts of violence as a means of effecting political or industrial change. The defendant was found to have assisted in organizing the Communist Labor Party of California, an organization found to have the specified character. It was held that the legislature was not unreasonable in believing organization of such a party "involves such danger to the public peace and the security of the State, that these acts should be penalized in the exercise of its police power." 274 U. S. at 371.

In neither of these cases did Mr. Justice Holmes and Mr. Justice Brandeis accept the reasoning of the Court. " 'The question,' " they said, quoting from *Schenck* v. *United States,* " 'in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that [the State] has a right to prevent.' " 268 U. S. at 672–673. Since the Manifesto circulated by Gitlow "had no chance of starting a present conflagration," 268 U. S. at 673, they dissented from the affirmance of his conviction. In *Whitney* v. *California,* they concurred in the result reached by the Court, but only because the record contained some evidence that organization of the Communist Labor Party might further a conspiracy to commit immediate serious crimes, and the credibility of the evidence was not put in issue by the defendant.[9]

(c) Subsequent decisions have added little to the principles established in these two groups of cases. In the only case arising under the Espionage Act decided by this Court during the last war, the substantiality of the evidence was the crucial issue. The defendant in *Hartzel*

---

[9] *Burns* v. *United States,* 274 U. S. 328, adds nothing to the decision in *Whitney* v. *California.*

v. *United States,* 322 U. S. 680, was an educated man and a citizen, not actively affiliated with any political group. In 1942 he wrote three articles condemning our wartime allies and urging that the war be converted into a racial conflict. He mailed the tracts to 600 people, including high-ranking military officers. According to his testimony his intention was to "create sentiment against war amongst the white races." The majority of this Court held that a jury could not reasonably infer from these facts that the defendant had acted with a specific intent to cause insubordination or disloyalty in the armed forces.

Of greater importance is the fact that the issue of law which divided the Court in the *Gitlow* and *Whitney* cases has not again been clearly raised, although in four additional instances we have reviewed convictions under comparable statutes. *Fiske* v. *Kansas,* 274 U. S. 380, involved a criminal syndicalism statute similar to that before us in *Whitney* v. *California.* We reversed a conviction based on evidence that the defendant exhibited an innocuous preamble to the constitution of the Industrial Workers of the World in soliciting members for that organization. In *Herndon* v. *Lowry,* 301 U. S. 242, the defendant had solicited members for the Communist Party, but there was no proof that he had urged or even approved those of the Party's aims which were unlawful. We reversed a conviction obtained under a statute prohibiting an attempt to incite to insurrection by violence, on the ground that the Fourteenth Amendment prohibited conviction where on the evidence a jury could not reasonably infer that the defendant had violated the statute the State sought to apply.[10]

---

[10] In *Herndon* v. *Georgia,* 295 U. S. 441, the opinion of the Court was concerned solely with a question of procedure. Mr. Justice Brandeis, Mr. Justice Stone, and Mr. Justice Cardozo, however, thought that the problem of *Gitlow* v. *New York* was raised. See 295 U. S. at 446.

The other two decisions go no further than to hold that the statute as construed by the State courts exceeded the bounds of a legislative judgment founded in reason. The statute presented in *De Jonge* v. *Oregon,* 299 U. S. 353, had been construed to apply to anyone who merely assisted in the conduct of a meeting held under the auspices of the Communist Party. In *Taylor* v. *Mississippi,* 319 U. S. 583, the statute prohibited dissemination of printed matter "designed and calculated to encourage violence, sabotage, or disloyalty to the government of the United States, or the state of Mississippi." We reversed a conviction for what we concluded was mere criticism and prophesy, without indicating whether we thought the statute could in any circumstances validly be applied. What the defendants communicated, we said, "is not claimed or shown to have been done with an evil or sinister purpose, to have advocated or incited subversive action against the nation or state, or to have threatened any clear and present danger to our institutions or our Government." 319 U. S. at 589–590.

I must leave to others the ungrateful task of trying to reconcile all these decisions. In some instances we have too readily permitted juries to infer deception from error, or intention from argumentative or critical statements. *Abrams* v. *United States, supra; Schaefer* v. *United States, supra; Pierce* v. *United States, supra; Gilbert* v. *Minnesota,* 254 U. S. 325. In other instances we weighted the interest in free speech so heavily that we permitted essential conflicting values to be destroyed. *Bridges* v. *California, supra; Craig* v. *Harney, supra.* Viewed as a whole, however, the decisions express an attitude toward the judicial function and a standard of values which for me are decisive of the case before us.

*First.*—Free-speech cases are not an exception to the principle that we are not legislators, that direct policymaking is not our province. How best to reconcile com-

peting interests is the business of legislatures, and the balance they strike is a judgment not to be displaced by ours, but to be respected unless outside the pale of fair judgment.

On occasion we have strained to interpret legislation in order to limit its effect on interests protected by the First Amendment. *Schneiderman* v. *United States, supra; Bridges* v. *Wixon, supra.* In some instances we have denied to States the deference to which I think they are entitled. *Bridges* v. *California, supra; Craig* v. *Harney, supra.* Once in this recent course of decisions the Court refused to permit a jury to draw inferences which seemed to me to be obviously reasonable. *Hartzel* v. *United States, supra.*

But in no case has a majority of this Court held that a legislative judgment, even as to freedom of utterance, may be overturned merely because the Court would have made a different choice between the competing interests had the initial legislative judgment been for it to make. In the cases in which the opinions go farthest towards indicating a total rejection of respect for legislative determinations, the interests between which choice was actually made were such that decision might well have been expressed in the familiar terms of want of reason in the legislative judgment. In *Thomas* v. *Collins,* 323 U. S. 516, for example, decision could not unreasonably have been placed on the ground that no substantial interest justified a State in requiring an out-of-State labor leader to register before speaking in advocacy of the cause of trade unionism. In *Martin* v. *City of Struthers,* 319 U. S. 141, it was broadly held that a municipality was not justified in prohibiting knocking on doors and ringing doorbells for the purpose of delivering handbills. But since the good faith and reasonableness of the regulation were placed in doubt by the fact that the city did not think it necessary also to prohibit door-to-door com-

mercial sales, decision could be sustained on narrower ground. And compare *Breard* v. *Alexandria, post,* p. 622, decided this day.

In other cases, moreover, we have given clear indication that even when free speech is involved we attach great significance to the determination of the legislature. *Gitlow* v. *New York, supra; Whitney* v. *California, supra; American Communications Assn.* v. *Douds, supra;* cf. *Bridges* v. *California,* 314 U. S. at 260. And see *Hughes* v. *Superior Court, supra; International Brotherhood of Teamsters Union* v. *Hanke, supra.*

In *Gitlow* v. *New York,* we put our respect for the legislative judgment in terms which, if they were accepted here, would make decision easy. For that case held that, when the legislature has determined that advocacy of forceful overthrow should be forbidden, a conviction may be sustained without a finding that in the particular case the advocacy had a close relation to a serious attempt at overthrow. We held that it was enough that the statute be a reasonable exercise of the legislative judgment, and that the defendant's conduct fall within the statute.

One of the judges below rested his affirmance on the *Gitlow* decision, and the defendants do not attempt to distinguish the case. They place their argument squarely on the ground that the case has been overruled by subsequent decisions. It has not been explicitly overruled. But it would be disingenuous to deny that the dissent in *Gitlow* has been treated with the respect usually accorded to a decision.

The result of the *Gitlow* decision was to send a left-wing Socialist to jail for publishing a Manifesto expressing Marxist exhortations. It requires excessive tolerance of the legislative judgment to suppose that the *Gitlow* publication in the circumstances could justify serious concern.

In contrast, there is ample justification for a legislative judgment that the conspiracy now before us is a substantial threat to national order and security. If the Smith Act is justified at all, it is justified precisely because it may serve to prohibit the type of conspiracy for which these defendants were convicted. The court below properly held that as a matter of separability the Smith Act may be limited to those situations to which it can constitutionally be applied. See 183 F. 2d at 214–215. Our decision today certainly does not mean that the Smith Act can constitutionally be applied to facts like those in *Gitlow* v. *New York*. While reliance may properly be placed on the attitude of judicial self-restraint which the *Gitlow* decision reflects, it is not necessary to depend on the facts or the full extent of the theory of that case in order to find that the judgment of Congress, as applied to the facts of the case now before us, is not in conflict with the First Amendment.

*Second.*—A survey of the relevant decisions indicates that the results which we have reached are on the whole those that would ensue from careful weighing of conflicting interests. The complex issues presented by regulation of speech in public places, by picketing, and by legislation prohibiting advocacy of crime have been resolved by scrutiny of many factors besides the imminence and gravity of the evil threatened. The matter has been well summarized by a reflective student of the Court's work. "The truth is that the clear-and-present-danger test is an oversimplified judgment unless it takes account also of a number of other factors: the relative seriousness of the danger in comparison with the value of the occasion for speech or political activity; the availability of more moderate controls than those which the state has imposed; and perhaps the specific intent with which the speech or activity is launched. No matter how rapidly we utter the phrase 'clear and present danger,' or how

closely we hyphenate the words, they are not a substitute for the weighing of values. They tend to convey a delusion of certitude when what is most certain is the complexity of the strands in the web of freedoms which the judge must disentangle." Freund, On Understanding the Supreme Court, 27–28.

It is a familiar experience in the law that new situations do not fit neatly into legal conceptions that arose under different circumstances to satisfy different needs. So it was when the injunction was tortured into an instrument of oppression against labor in industrial conflicts. So it is with the attempt to use the direction of thought lying behind the criterion of "clear and present danger" wholly out of the context in which it originated, and to make of it an absolute dogma and definitive measuring rod for the power of Congress to deal with assaults against security through devices other than overt physical attempts.

Bearing in mind that Mr. Justice Holmes regarded questions under the First Amendment as questions of "proximity and degree," *Schenck* v. *United States,* 249 U. S. at 52, it would be a distortion, indeed a mockery, of his reasoning to compare the "puny anonymities," 250 U. S. at 629, to which he was addressing himself in the *Abrams* case in 1919 or the publication that was "futile and too remote from possible consequences," 268 U. S. at 673, in the *Gitlow* case in 1925 with the setting of events in this case in 1950.

"It does an ill-service to the author of the most quoted judicial phrases regarding freedom of speech, to make him the victim of a tendency which he fought all his life, whereby phrases are made to do service for critical analysis by being turned into dogma. 'It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis.' Holmes, J., dissenting, in *Hyde* v. *United*

*States,* 225 U. S. 347, 384, at 391." The phrase "clear and present danger," in its origin, "served to indicate the importance of freedom of speech to a free society but also to emphasize that its exercise must be compatible with the preservation of other freedoms essential to a democracy and guaranteed by our Constitution." *Pennekamp* v. *Florida,* 328 U. S. 331, 350, 352–353 (concurring). It were far better that the phrase be abandoned than that it be sounded once more to hide from the believers in an absolute right of free speech the plain fact that the interest in speech, profoundly important as it is, is no more conclusive in judicial review than other attributes of democracy or than a determination of the people's representatives that a measure is necessary to assure the safety of government itself.

*Third.*—Not every type of speech occupies the same position on the scale of values. There is no substantial public interest in permitting certain kinds of utterances: "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572. We have frequently indicated that the interest in protecting speech depends on the circumstances of the occasion. See cases collected in *Niemotko* v. *Maryland,* 340 U. S. at 275–283. It is pertinent to the decision before us to consider where on the scale of values we have in the past placed the type of speech now claiming constitutional immunity.

The defendants have been convicted of conspiring to organize a party of persons who advocate the overthrow of the Government by force and violence. The jury has found that the object of the conspiracy is advocacy as "a rule or principle of action," "by language reasonably and ordinarily calculated to incite persons to such action,"

and with the intent to cause the overthrow "as speedily as circumstances would permit."

On any scale of values which we have hitherto recognized, speech of this sort ranks low.

Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken. The distinction has its root in the conception of the common law, supported by principles of morality, that a person who procures another to do an act is responsible for that act as though he had done it himself. This principle was extended in *Fox* v. *Washington, supra,* to words directed to the public generally which would constitute an incitement were they directed to an individual. It was adapted in *Schenck* v. *United States, supra,* into a rule of evidence designed to restrict application of the Espionage Act. It was relied on by the Court in *Gitlow* v. *New York, supra.* The distinction has been repeated in many of the decisions in which we have upheld the claims of speech. We frequently have distinguished protected forms of expression from statements which "incite to violence and crime and threaten the overthrow of organized government by unlawful means." *Stromberg* v. *California,* 283 U. S. at 369. See also *Near* v. *Minnesota,* 283 U. S. at 716; *De Jonge* v. *Oregon,* 299 U. S. at 365; *Cantwell* v. *Connecticut,* 310 U. S. 296, 308; *Taylor* v. *Mississippi,* 319 U. S. at 589.

It is true that there is no divining rod by which we may locate "advocacy." Exposition of ideas readily merges into advocacy. The same Justice who gave currency to application of the incitement doctrine in this field dissented four times from what he thought was its misapplication. As he said in the *Gitlow* dissent, "Every idea is an incitement." 268 U. S. at 673. Even though advocacy of overthrow deserves little protection, we should hesitate to prohibit it if we thereby inhibit the

interchange of rational ideas so essential to representative government and free society.

But there is underlying validity in the distinction between advocacy and the interchange of ideas, and we do not discard a useful tool because it may be misused. That such a distinction could be used unreasonably by those in power against hostile or unorthodox views does not negate the fact that it may be used reasonably against an organization wielding the power of the centrally controlled international Communist movement. The object of the conspiracy before us is so clear that the chance of error in saying that the defendants conspired to advocate rather than to express ideas is slight. MR. JUSTICE DOUGLAS quite properly points out that the conspiracy before us is not a conspiracy to overthrow the Government. But it would be equally wrong to treat it as a seminar in political theory.

### III.

These general considerations underlie decision of the case before us.

On the one hand is the interest in security. The Communist Party was not designed by these defendants as an ordinary political party. For the circumstances of its organization, its aims and methods, and the relation of the defendants to its organization and aims we are concluded by the jury's verdict. The jury found that the Party rejects the basic premise of our political system— that change is to be brought about by nonviolent constitutional process. The jury found that the Party advocates the theory that there is a duty and necessity to overthrow the Government by force and violence. It found that the Party entertains and promotes this view, not as a prophetic insight or as a bit of unworldly specula-

tion, but as a program for winning adherents and as a policy to be translated into action.

In finding that the defendants violated the statute, we may not treat as established fact that the Communist Party in this country is of significant size, well-organized, well-disciplined, conditioned to embark on unlawful activity when given the command. But in determining whether application of the statute to the defendants is within the constitutional powers of Congress, we are not limited to the facts found by the jury. We must view such a question in the light of whatever is relevant to a legislative judgment. We may take judicial notice that the Communist doctrines which these defendants have conspired to advocate are in the ascendency in powerful nations who cannot be acquitted of unfriendliness to the institutions of this country. We may take account of evidence brought forward at this trial and elsewhere, much of which has long been common knowledge. In sum, it would amply justify a legislature in concluding that recruitment of additional members for the Party would create a substantial danger to national security.

In 1947, it has been reliably reported, at least 60,000 members were enrolled in the Party.[11] Evidence was introduced in this case that the membership was organized in small units, linked by an intricate chain of command, and protected by elaborate precautions designed to prevent disclosure of individual identity. There are no reliable data tracing acts of sabotage or espionage directly to these defendants. But a Canadian Royal Commission appointed in 1946 to investigate espionage reported that it was "overwhelmingly established" that

---

[11] See the testimony of the Director of the Federal Bureau of Investigation. Hearings before the House Committee on Un-American Activities, on H. R. 1884 and H. R. 2122, 80th Cong., 1st Sess., Part 2, p. 37.

548

"the Communist movement was the principal base within which the espionage network was recruited."[12] The most notorious spy in recent history was led into the service of the Soviet Union through Communist indoctrination.[13] Evidence supports the conclusion that members of the Party seek and occupy positions of importance in political and labor organizations.[14] Congress was not barred by the Constitution from believing that indifference to such experience would be an exercise not of freedom but of irresponsibility.

On the other hand is the interest in free speech. The right to exert all governmental powers in aid of maintaining our institutions and resisting their physical overthrow does not include intolerance of opinions and speech that cannot do harm although opposed and perhaps alien to dominant, traditional opinion. The treatment of its

---

[12] Report of the Royal Commission to Investigate Communication of Secret and Confidential Information to Agents of a Foreign Power, June 27, 1946, p. 44. There appears to be little reliable evidence demonstrating directly that the Communist Party in this country has recruited persons willing to engage in espionage or other unlawful activity on behalf of the Soviet Union. The defection of a Soviet diplomatic employee, however, led to a careful investigation of an espionage network in Canada, and has disclosed the effectiveness of the Canadian Communist Party in conditioning its members to disclose to Soviet agents vital information of a secret character. According to the Report of the Royal Commission investigating the network, conspiratorial characteristics of the Party similar to those shown in the evidence now before us were instrumental in developing the necessary motivation to cooperate in the espionage. See pp. 43–83 of the Report.

[13] The Communist background of Dr. Klaus Fuchs was brought out in the proceedings against him. See The [London] Times, Mar. 2, 1950, p. 2, col. 6.

[14] See *American Communications Assn.* v. *Douds,* 339 U. S. 382. Former Senator Robert M. La Follette, Jr., has reported his experience with infiltration of Communist sympathizers into congressional committee staffs. Collier's, Feb. 8, 1947, p. 22.

minorities, especially their legal position, is among the most searching tests of the level of civilization attained by a society. It is better for those who have almost unlimited power of government in their hands to err on the side of freedom. We have enjoyed so much freedom for so long that we are perhaps in danger of forgetting how much blood it cost to establish the Bill of Rights.

Of course no government can recognize a "right" of revolution, or a "right" to incite revolution if the incitement has no other purpose or effect. But speech is seldom restricted to a single purpose, and its effects may be manifold. A public interest is not wanting in granting freedom to speak their minds even to those who advocate the overthrow of the Government by force. For, as the evidence in this case abundantly illustrates, coupled with such advocacy is criticism of defects in our society. Criticism is the spur to reform; and Burke's admonition that a healthy society must reform in order to conserve has not lost its force. Astute observers have remarked that one of the characteristics of the American Republic is indifference to fundamental criticism. Bryce, The American Commonwealth, c. 84. It is a commonplace that there may be a grain of truth in the most uncouth doctrine, however false and repellent the balance may be. Suppressing advocates of overthrow inevitably will also silence critics who do not advocate overthrow but fear that their criticism may be so construed. No matter how clear we may be that the defendants now before us are preparing to overthrow our Government at the propitious moment, it is self-delusion to think that we can punish them for their advocacy without adding to the risks run by loyal citizens who honestly believe in some of the reforms these defendants advance. It is a sobering fact that in sustaining the convictions before us we can hardly escape restriction on the interchange of ideas.

We must not overlook the value of that interchange. Freedom of expression is the well-spring of our civilization—the civilization we seek to maintain and further by recognizing the right of Congress to put some limitation upon expression. Such are the paradoxes of life. For social development of trial and error, the fullest possible opportunity for the free play of the human mind is an indispensable prerequisite. The history of civilization is in considerable measure the displacement of error which once held sway as official truth by beliefs which in turn have yielded to other truths. Therefore the liberty of man to search for truth ought not to be fettered, no matter what orthodoxies he may challenge. Liberty of thought soon shrivels without freedom of expression. Nor can truth be pursued in an atmosphere hostile to the endeavor or under dangers which are hazarded only by heroes.

"The interest, which [the First Amendment] guards, and which gives it its importance, presupposes that there are no orthodoxies—religious, political, economic, or scientific—which are immune from debate and dispute. Back of that is the assumption—itself an orthodoxy, and the one permissible exception—that truth will be most likely to emerge, if no limitations are imposed upon utterances that can with any plausibility be regarded as efforts to present grounds for accepting or rejecting propositions whose truth the utterer asserts, or denies." *International Brotherhood of Electrical Workers* v. *Labor Board,* 181 F. 2d 34, 40. In the last analysis it is on the validity of this faith that our national security is staked.

It is not for us to decide how we would adjust the clash of interests which this case presents were the primary responsibility for reconciling it ours. Congress has determined that the danger created by advocacy of overthrow justifies the ensuing restriction on freedom of speech. The determination was made after due deliberation, and

the seriousness of the congressional purpose is attested by the volume of legislation passed to effectuate the same ends.[15]

Can we then say that the judgment Congress exercised was denied it by the Constitution? Can we establish a constitutional doctrine which forbids the elected representatives of the people to make this choice? Can we hold that the First Amendment deprives Congress of what it deemed necessary for the Government's protection?

To make validity of legislation depend on judicial reading of events still in the womb of time—a forecast, that is, of the outcome of forces at best appreciated only with knowledge of the topmost secrets of nations—is to charge the judiciary with duties beyond its equipment. We do not expect courts to pronounce historic verdicts on bygone events. Even historians have conflicting views to this day on the origins and conduct of the French Revolution, or, for that matter, varying interpretations of "the glorious Revolution" of 1688. It is as absurd to be confident that we can measure the present clash of forces and

---

[15] Immigration laws require, for instance, exclusion and deportation of aliens who advocate the overthrow of the Government by force and violence, and declare ineligible for naturalization aliens who are members of organizations so advocating. Act of Feb. 5, 1917, § 19, 39 Stat. 889, 8 U. S. C. § 155; Act of Oct. 16, 1918, 40 Stat. 1012, 8 U. S. C. § 137; Act of Oct. 14, 1940, § 305, 54 Stat. 1141, 8 U. S. C. § 705. The Hatch Act prohibits employment by any Government agency of members of organizations advocating overthrow of "our constitutional form of government." Act of Aug. 2, 1939, § 9A, 53 Stat. 1148, 5 U. S. C. (Supp. III) § 118j. The Voorhis Act of Oct. 17, 1940, was passed to require registration of organizations subject to foreign control which engage in political activity. 54 Stat. 1201, 18 U. S. C. § 2386. The Taft-Hartley Act contains a section designed to exclude Communists from positions of leadership in labor organizations. Act of June 23, 1947, § 9 (h), 61 Stat. 146, 29 U. S. C. (Supp. III) § 159 (h). And, most recently, the McCarran Act requires registration of "Communist-action" and "Communist-front" organizations. Act of Sept. 23, 1950, § 7, 64 Stat. 987, 993.

their outcome as to ask us to read history still enveloped in clouds of controversy.

In the light of their experience, the Framers of the Constitution chose to keep the judiciary dissociated from direct participation in the legislative process. In asserting the power to pass on the constitutionality of legislation, Marshall and his Court expressed the purposes of the Founders. See Charles A. Beard, The Supreme Court and the Constitution. But the extent to which the exercise of this power would interpenetrate matters of policy could hardly have been foreseen by the most prescient. The distinction which the Founders drew between the Court's duty to pass on the power of Congress and its complementary duty not to enter directly the domain of policy is fundamental. But in its actual operation it is rather subtle, certainly to the common understanding. Our duty to abstain from confounding policy with constitutionality demands perceptive humility as well as self-restraint in not declaring unconstitutional what in a judge's private judgment is deemed unwise and even dangerous.

Even when moving strictly within the limits of constitutional adjudication, judges are concerned with issues that may be said to involve vital finalities. The too easy transition from disapproval of what is undesirable to condemnation as unconstitutional, has led some of the wisest judges to question the wisdom of our scheme in lodging such authority in courts. But it is relevant to remind that in sustaining the power of Congress in a case like this nothing irrevocable is done. The democratic process at all events is not impaired or restricted. Power and responsibility remain with the people and immediately with their representatives. All the Court says is that Congress was not forbidden by the Constitution to pass this enactment and that a prosecution under it may be brought against a conspiracy such as the one before us.

## IV.

The wisdom of the assumptions underlying the legislation and prosecution is another matter. In finding that Congress has acted within its power, a judge does not remotely imply that he favors the implications that lie beneath the legal issues. Considerations there enter which go beyond the criteria that are binding upon judges within the narrow confines of their legitimate authority. The legislation we are here considering is but a truncated aspect of a deeper issue. For me it has been most illuminatingly expressed by one in whom responsibility and experience have fructified native insight, the Director-General of the British Broadcasting Corporation:

"We have to face up to the fact that there are powerful forces in the world today misusing the privileges of liberty in order to destroy her. The question must be asked, however, whether suppression of information or opinion is the true defense. We may have come a long way from Mill's famous dictum that:

" 'If all mankind minus one were of one opinion, and only one person were of the contrary opinion, mankind would be no more justified in silencing that one person, than he, if he had the power, would be justified in silencing mankind,'

but Mill's reminders from history as to what has happened when suppression was most virulently exercised ought to warn us that no debate is ever permanently won by shutting one's ears or by even the most Draconian policy of silencing opponents. The *debate* must be won. And it must be won with full information. Where there are lies, they must be shown for what they are. Where there are errors, they must be refuted. It would be a major defeat if the enemies of democracy forced us to abandon our faith in the power of informed discussion and so brought us down

to their own level. Mankind is so constituted, moreover, that if, where expression and discussion are concerned, the enemies of liberty are met with a denial of liberty, many men of goodwill will come to suspect there is something in the proscribed doctrine after all. Erroneous doctrines thrive on being expunged. They die if exposed." Sir William Haley, What Standards for Broadcasting? Measure, Vol. I, No. 3, Summer 1950, pp. 211–212.

In the context of this deeper struggle, another voice has indicated the limitations of what we decide today. No one is better equipped than George F. Kennan to speak on the meaning of the menace of Communism and the spirit in which we should meet it.

"If our handling of the problem of Communist influence in our midst is not carefully moderated— if we permit it, that is, to become an emotional preoccupation and to blind us to the more important positive tasks before us—we can do a damage to our national purpose beyond comparison greater than anything that threatens us today from the Communist side. The American Communist party is today, by and large, an external danger. It represents a tiny minority in our country; it has no real contact with the feelings of the mass of our people; and its position as the agency of a hostile foreign power is clearly recognized by the overwhelming mass of our citizens.

"But the subjective emotional stresses and temptations to which we are exposed in our attempt to deal with this domestic problem are not an external danger: they represent a danger within ourselves— a danger that something may occur in our own minds and souls which will make us no longer like the persons by whose efforts this republic was founded and held together, but rather like the representatives

of that very power we are trying to combat: intolerant, secretive, suspicious, cruel, and terrified of internal dissension because we have lost our own belief in ourselves and in the power of our ideals. The worst thing that our Communists could do to us, and the thing we have most to fear from their activities, is that we should become like them.

"That our country is beset with external dangers I readily concede. But these dangers, at their worst, are ones of physical destruction, of the disruption of our world security, of expense and inconvenience and sacrifice. These are serious, and sometimes terrible things, but they are all things that we can take and still remain Americans.

"The internal danger is of a different order. America is not just territory and people. There is lots of territory elsewhere, and there are lots of people; but it does not add up to America. America is something in our minds and our habits of outlook which causes us to believe in certain things and to behave in certain ways, and by which, in its totality, we hold ourselves distinguished from others. If that once goes there will be no America to defend. And that can go too easily if we yield to the primitive human instinct to escape from our frustrations into the realms of mass emotion and hatred and to find scapegoats for our difficulties in individual fellow-citizens who are, or have at one time been, disoriented or confused." George F. Kennan, Where Do You Stand on Communism? New York Times Magazine, May 27, 1951, pp. 7, 53, 55.

Civil liberties draw at best only limited strength from legal guaranties. Preoccupation by our people with the constitutionality, instead of with the wisdom, of legislation or of executive action is preoccupation with a false value. Even those who would most freely use the judicial

brake on the democratic process by invalidating legislation that goes deeply against their grain, acknowledge, at least by paying lip service, that constitutionality does not exact a sense of proportion or the sanity of humor or an absence of fear. Focusing attention on constitutionality tends to make constitutionality synonymous with wisdom. When legislation touches freedom of thought and freedom of speech, such a tendency is a formidable enemy of the free spirit. Much that should be rejected as illiberal, because repressive and envenoming, may well be not unconstitutional. The ultimate reliance for the deepest needs of civilization must be found outside their vindication in courts of law; apart from all else, judges, howsoever they may conscientiously seek to discipline themselves against it, unconsciously are too apt to be moved by the deep undercurrents of public feeling. A persistent, positive translation of the liberating faith into the feelings and thoughts and actions of men and women is the real protection against attempts to strait-jacket the human mind. Such temptations will have their way, if fear and hatred are not exorcized. The mark of a truly civilized man is confidence in the strength and security derived from the inquiring mind. We may be grateful for such honest comforts as it supports, but we must be unafraid of its incertitudes. Without open minds there can be no open society. And if society be not open the spirit of man is mutilated and becomes enslaved.

APPENDIX TO OPINION OF MR. JUSTICE FRANKFURTER.

Opinions responsible for the view that speech could not constitutionally be restricted unless there would result from it an imminent—*i. e.,* close at hand—substantive evil.

1. *Thornhill* v. *Alabama,* 310 U. S. 88, 104–105 (State statute prohibiting picketing held invalid): ". . . Every

expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgment of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion. . . .

". . . [N]o clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter."

2. *Bridges* v. *California*, 314 U. S. 252, 262–263 (convictions for contempt of court reversed): ". . . [T]he 'clear and present danger' language of the *Schenck* case has afforded practical guidance in a great variety of cases in which the scope of constitutional protections of freedom of expression was in issue. It has been utilized by either a majority or minority of this Court in passing upon the constitutionality of convictions under espionage acts, *Schenck* v. *United States, supra* [249 U. S. 47]; *Abrams* v. *United States,* 250 U. S. 616; under a criminal syndicalism act, *Whitney* v. *California, supra* [274 U. S. 357]; under an 'anti-insurrection' act, *Herndon* v. *Lowry, supra* [301 U. S. 242]; and for breach of the peace at common law, *Cantwell* v. *Connecticut, supra* [310 U. S. 296]. And very recently we have also suggested that 'clear and present danger' is an appropriate guide in determining the constitutionality of restrictions upon expression where the substantive evil sought to be prevented

by the restriction is 'destruction of life or property, or invasion of the right of privacy.' *Thornhill* v. *Alabama,* 310 U. S. 88, 105.

. . . . .

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

3. *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 639 (flag-salute requirement for school children held invalid): "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are suscep-

tible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case."

4. *Thomas* v. *Collins*, 323 U. S. 516, 529–530 (State statute requiring registration of labor organizers held invalid as applied): "The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. *Schneider* v. *State,* 308 U. S. 147; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Prince* v. *Massachusetts,* 321 U. S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153.

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation."

5. *Craig* v. *Harney,* 331 U. S. 367, 376 (conviction for contempt of court reversed): "The fires which [the language] kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil."

6. *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 503 (injunction against picketing upheld): ". . . There was clear danger, imminent and immediate, that unless restrained, appellants would succeed in making [the State's policy against restraints of trade] a dead letter insofar as purchases by nonunion men were concerned. . . ."

7. *Terminiello* v. *Chicago,* 337 U. S. 1, 4–5 (conviction for disorderly conduct reversed): "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky* v. *New Hampshire, supra,* [315 U. S. 568] 571–572, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. See *Bridges* v. *California,* 314 U. S. 252, 262; *Craig* v. *Harney,* 331 U. S. 367, 373. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."

8. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 396, 412 ("Non-Communist affidavit" provision of Taft-Hartley Act upheld): "Speech may be fought with speech. Falsehoods and fallacies must be exposed, not suppressed, unless there is not sufficient time to avert the evil consequences of noxious doctrine by argument and education. That is the command of the First Amendment." And again, "[The First] Amendment requires

that one be permitted to believe what he will. It requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial public evil will result therefrom."

MR. JUSTICE JACKSON, concurring.

This prosecution is the latest of never-ending, because never successful, quests for some legal formula that will secure an existing order against revolutionary radicalism. It requires us to reappraise, in the light of our own times and conditions, constitutional doctrines devised under other circumstances to strike a balance between authority and liberty.

Activity here charged to be criminal is conspiracy—that defendants conspired to teach and advocate, and to organize the Communist Party to teach and advocate, overthrow and destruction of the Government by force and violence. There is no charge of actual violence or attempt at overthrow.[1]

The principal reliance of the defense in this Court is that the conviction cannot stand under the Constitution because the conspiracy of these defendants presents no "clear and present danger" of imminent or foreseeable overthrow.

---

[1] The Government's own summary of its charge is: "The indictment charged that from April 1, 1945, to the date of the indictment petitioners unlawfully, wilfully, and knowingly conspired with each other and with other persons unknown to the grand jury (1) to organize as the Communist Party of the United States of America a society, group and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence, and (2) knowingly and wilfully to advocate and teach the duty and necessity of overthrowing and destroying the Government of the United States by force and violence. The indictment alleged that Section 2 of the Smith Act proscribes these acts and that the conspiracy to take such action is a violation of Section 3 of the act (18 U. S. C. 10, 11 (1946 ed.))."

## I.

The statute before us repeats a pattern, originally devised to combat the wave of anarchistic terrorism that plagued this country about the turn of the century,[2] which lags at least two generations behind Communist Party techniques.

Anarchism taught a philosophy of extreme individualism and hostility to government and property. Its avowed aim was a more just order, to be achieved by violent destruction of all government.[3] Anarchism's sporadic and uncoordinated acts of terror were not integrated with an effective revolutionary machine, but the Chicago Haymarket riots of 1886,[4] attempted murder of the industrialist Frick, attacks on state officials, and

---

[2] The Government says this Act before us was modeled after the New York Act of 1909, sustained by this Court in *Gitlow* v. *New York*, 268 U. S. 652. That, in turn, as the Court pointed out, followed an earlier New York Act of 1902. Shortly after the assassination of President McKinley by an anarchist, Congress adopted the same concepts in the Immigration Act of March 3, 1903. 32 Stat. 1213, § 2. Some germs of the same concept can be found in some reconstruction legislation, such as the Enforcement Act of 1871, 17 Stat. 13. The Espionage Act of 1917, 40 Stat. 217, tit. 1, § 3, which gave rise to a series of civil-rights decisions, applied only during war and defined as criminal "false statements with intent" to interfere with our war effort or cause insubordination in the armed forces or obstruct recruiting. However, a wave of "criminal syndicalism statutes" were enacted by the States. They were generally upheld, *Whitney* v. *California*, 274 U. S. 357, and prosecutions under them were active from 1919 to 1924. In California alone, 531 indictments were returned and 164 persons convicted. 4 Encyc. Soc. Sci. 582, 583. The Smith Act followed closely the terminology designed to incriminate the methods of terroristic anarchism.

[3] Elementary texts amplify the theory and practice of these movements which must be greatly oversimplified in this opinion. See Anarchism, 2 Encyc. Soc. Sci. 46; Nihilism, 11 Encyc. Soc. Sci. 377.

[4] *Spies* v. *Illinois*, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898.

assassination of President McKinley in 1901, were fruits of its preaching.

However, extreme individualism was not conducive to cohesive and disciplined organization. Anarchism fell into disfavor among incendiary radicals, many of whom shifted their allegiance to the rising Communist Party. Meanwhile, in Europe anarchism had been displaced by Bolshevism as the doctrine and strategy of social and political upheaval. Led by intellectuals hardened by revolutionary experience, it was a more sophisticated, dynamic and realistic movement. Establishing a base in the Soviet Union, it founded an aggressive international Communist apparatus which has modeled and directed a revolutionary movement able only to harass our own country. But it has seized control of a dozen other countries.

Communism, the antithesis of anarchism,[5] appears today as a closed system of thought representing Stalin's

---

[5] Prof. Beard demonstrates this antithesis by quoting the Russian anarchist leader Bakunin, as follows:

" 'Marx is an authoritarian and centralizing communist. He wishes what we wish: the complete triumph of economic and social equality, however, within the state and through the power of the state, through the dictatorship of a very strong and, so to speak, despotic provisional government, that is, by the negation of liberty. His economic ideal is the state as the sole owner of land and capital, tilling the soil by means of agricultural associations, under the management of its engineers, and directing through the agency of capital all industrial and commercial associations.

" 'We demand the same triumph of economic and social equality through the abolition of the state and everything called juridical right, which is according to our view the permanent negation of human right. We wish the reconstruction of society and the establishment of the unity of mankind not from above downward through authority, through socialistic officials, engineers and public technicians, but from below upward through the voluntary federation of labor associations of all kinds emancipated entirely from the yoke of the state.' "
Beard, Individualism and Capitalism, 1 Encyc. Soc. Sci. 145, 158.

version of Lenin's version of Marxism. As an ideology, it is not one of spontaneous protest arising from American working-class experience. It is a complicated system of assumptions, based on European history and conditions, shrouded in an obscure and ambiguous vocabulary, which allures our ultrasophisticated intelligentsia more than our hard-headed working people. From time to time it champions all manner of causes and grievances and makes alliances that may add to its foothold in government or embarrass the authorities.

The Communist Party, nevertheless, does not seek its strength primarily in numbers. Its aim is a relatively small party whose strength is in selected, dedicated, indoctrinated, and rigidly disciplined members. From established policy it tolerates no deviation and no debate. It seeks members that are, or may be, secreted in strategic posts in transportation, communications, industry, government, and especially in labor unions where it can compel employers to accept and retain its members.[6] It also seeks to infiltrate and control organizations of professional and other groups. Through these placements in positions of power it seeks a leverage over society that will make up in power of coercion what it lacks in power of persuasion.

The Communists have no scruples against sabotage, terrorism, assassination, or mob disorder; but violence is not with them, as with the anarchists, an end in itself. The Communist Party advocates force only when prudent and profitable. Their strategy of stealth precludes premature or uncoordinated outbursts of violence, except, of course, when the blame will be placed on shoulders other than their own. They resort to violence as to truth, not

---

[6] For methods and objects of infiltration of labor unions, see *American Communications Assn.* v. *Douds*, 339 U. S. 382, 422.

as a principle but as an expedient. Force or violence, as they would resort to it, may never be necessary, because infiltration and deception may be enough.

Force would be utilized by the Communist Party not to destroy government but for its capture. The Communist recognizes that an established government in control of modern technology cannot be overthrown by force until it is about ready to fall of its own weight. Concerted uprising, therefore, is to await that contingency and revolution is seen, not as a sudden episode, but as the consummation of a long process.

The United States, fortunately, has experienced Communism only in its preparatory stages and for its pattern of final action must look abroad. Russia, of course, was the pilot Communist revolution, which to the Marxist confirms the Party's assumptions and points its destiny.[7]

---

[7] The Czar's government, in February 1917, literally gave up, almost without violence, to the Provisional Government, because it was ready to fall apart from its corruption, ineptitude, superstition, oppression and defeat. The revolutionary parties had little to do with this and regarded it as a *bourgeoisie* triumph. Lenin was an exile in Switzerland, Trotsky in the United States, and Stalin was in Siberia. The Provisional Government attempted to continue the war against Germany, but it, too, was unable to solve internal problems and its Galician campaign failed with heavy losses. By October, its prestige and influence sank so low that it could not continue. Meanwhile, Lenin and Trotsky had returned and consolidated the Bolshevik position around the Soviets, or trade unions. They simply took over power in an almost bloodless revolution between October 25 and November 7, 1917. That Lenin and Trotsky represented only a minority was demonstrated in November elections, in which the Bolsheviks secured less than a quarter of the seats. Then began the series of opportunistic movements to entrench themselves in power. Faced by invasion of the allies, by counterrevolution, and the attempted assassination of Lenin, terrorism was resorted to on a large scale and all the devices of the Czar's police state were reestablished. See 1 Carr, The Bolshevik Revolution 1917–1923, 99–110, and Moore, Soviet Politics—The Dilemma of Power, 117–139.

But Communist technique in the overturn of a free government was disclosed by the *coup d'etat* in which they seized power in Czechoslovakia.[8] There the Communist Party during its preparatory stage claimed and received protection for its freedoms of speech, press, and assembly. Pretending to be but another political party, it eventually was conceded participation in government, where it entrenched reliable members chiefly in control of police and information services. When the government faced a foreign and domestic crisis, the Communist Party had established a leverage strong enough to threaten civil war. In a period of confusion the Communist plan unfolded and the underground organization came to the surface throughout the country in the form chiefly of labor "action committees." Communist officers of the unions took over transportation and allowed only persons with party permits to travel. Communist printers took over the newspapers and radio and put out only party-approved versions of events. Possession was taken of telegraph and telephone systems and communications were cut off wherever directed by party heads. Communist unions took over the factories, and in the cities a partisan distribution of food was managed by the Communist organization. A virtually bloodless abdication by the elected government admitted the Communists to power, whereupon they instituted a reign of oppression and terror, and ruthlessly denied to all others the freedoms which had sheltered their conspiracy.

---

[8] Duchacek, The Strategy of Communist Infiltration: Czechoslovakia, 1944–1948, World Politics, Vol. II, No. 3 (April 1950), 345–372; and The February Coup in Czechoslovakia, *id.*, July 1950, 511–532; see also Kertesz, The Methods of Communist Conquest: Hungary, 1944–1947, *id.*, October 1950, 20–54; Lasswell, The Strategy of Soviet Propaganda, 24 Acad. Pol. Sci. Proc. 214, 221. See also Friedman, The Break-up of Czech Democracy.

## II.

The foregoing is enough to indicate that, either by accident or design, the Communist stratagem outwits the anti-anarchist pattern of statute aimed against "overthrow by force and violence" if qualified by the doctrine that only "clear and present danger" of accomplishing that result will sustain the prosecution.

The "clear and present danger" test was an innovation by Mr. Justice Holmes in the *Schenck* case,[9] reiterated and refined by him and Mr. Justice Brandeis in later cases,[10] all arising before the era of World War II revealed the subtlety and efficacy of modernized revolutionary techniques used by totalitarian parties. In those cases, they were faced with convictions under so-called criminal syndicalism statutes aimed at anarchists but which, loosely construed, had been applied to punish socialism, pacifism, and left-wing ideologies, the charges often resting on far-

---

[9] *Schenck* v. *United States*, 249 U. S. 47. This doctrine has been attacked as one which "annuls the most significant purpose of the First Amendment. It destroys the intellectual basis of our plan of self-government." Meiklejohn, Free Speech And Its Relation to Self-Government, 29. It has been praised: "The concept of freedom of speech received for the first time an authoritative judicial interpretation in accord with the purpose of the framers of the Constitution." Chafee, Free Speech in the United States, 82. In either event, it is the only original judicial thought on the subject, all later cases having made only extensions of its application. All agree that it means something very important, but no two seem to agree on what it is. See concurring opinion, MR. JUSTICE FRANKFURTER, *Kovacs* v. *Cooper*, 336 U. S. 77, 89.

[10] *Gitlow* v. *New York*, 268 U. S. 652; *Whitney* v. *California*, 274 U. S. 357. Holmes' comment on the former, in his letters to Sir Frederick Pollock of June 2 and 18, 1925, as "a case in which conscience and judgment are a little in doubt," and description of his dissent as one "in favor of the rights of an anarchist (so-called) to talk drool in favor of the proletarian dictatorship" show the tentative nature of his test, even as applied to a trivial case. Holmes-Pollock Letters (Howe ed. 1946).

fetched inferences which, if true, would establish only technical or trivial violations. They proposed "clear and present danger" as a test for the sufficiency of evidence in particular cases.

I would save it, unmodified, for application as a "rule of reason" [11] in the kind of case for which it was devised. When the issue is criminality of a hot-headed speech on a street corner, or circulation of a few incendiary pamphlets, or parading by some zealots behind a red flag, or refusal of a handful of school children to salute our flag, it is not beyond the capacity of the judicial process to gather, comprehend, and weigh the necessary materials for decision whether it is a clear and present danger of substantive evil or a harmless letting off of steam. It is not a prophecy, for the danger in such cases has matured by the time of trial or it was never present. The test applies and has meaning where a conviction is sought to be based on a speech or writing which does not directly or explicitly advocate a crime but to which such tendency is sought to be attributed by construction or by implication from external circumstances. The formula in such cases favors freedoms that are vital to our society, and, even if sometimes applied too generously, the consequences cannot be grave. But its recent expansion has extended, in particular to Communists, unprecedented immunities.[12] Unless we are to hold our Government captive in a judge-made verbal trap, we must approach the problem of a well-organized, nation-wide conspiracy, such as I have

---

[11] So characterized by Mr. Justice Brandeis in *Schaefer* v. *United States*, 251 U. S. 466, 482.

[12] Recent cases have pushed the "clear and present danger" doctrine to greater extremes. While Mr. Justice Brandeis said only that the evil to be feared must be "imminent" and "relatively serious," *Whitney* v. *California*, 274 U. S. 357, 376 and 377, more recently it was required "that the substantive evil must be *extremely* serious and the

569

described, as realistically as our predecessors faced the trivialities that were being prosecuted until they were checked with a rule of reason.

I think reason is lacking for applying that test to this case.

---

*degree of imminence extremely high* before utterances can be punished." *Bridges* v. *California,* 314 U. S. 252, 263. (Italics supplied.)

*Schneiderman* v. *United States,* 320 U. S. 118, overruled earlier holdings that the courts could take judicial notice that the Communist Party does advocate overthrow of the Government by force and violence. This Court reviewed much of the basic Communist literature that is before us now, and held that it was within "the area of allowable thought," *id.,* at 139, that it does not show lack of attachment to the Constitution, and that success of the Communist Party would not necessarily mean the end of representative government. The Court declared further that "A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were no longer open." *Id.,* at 157. Moreover, the Court considered that this "mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time—prediction that is not calculated or intended to be presently acted upon, . . . ." *ibid.,* was within the realm of free speech. A dissent by Mr. Chief Justice Stone, for himself and Justices Roberts and Frankfurter, challenged these naive conclusions, as they did again in *Bridges* v. *Wixon,* 326 U. S. 135, in which the Court again set aside an Attorney General's deportation order. Here Mr. Justice Murphy, without whom there would not have been a majority for the decision, speaking for himself in a concurring opinion, pronounced the whole deportation statute unconstitutional, as applied to Communists, under the "clear and present danger test," because, "Not the slightest evidence was introduced to show that either Bridges or the Communist Party seriously and imminently threatens to uproot the Government by force or violence." 326 U. S. at 165.

If we must decide that this Act and its application are constitutional only if we are convinced that petitioner's conduct creates a "clear and present danger" of violent overthrow, we must appraise imponderables, including international and national phenomena which baffle the best informed foreign offices and our most experienced politicians. We would have to foresee and predict the effectiveness of Communist propaganda, opportunities for infiltration, whether, and when, a time will come that they consider propitious for action, and whether and how fast our existing government will deteriorate. And we would have to speculate as to whether an approaching Communist *coup* would not be anticipated by a nationalistic fascist movement. No doctrine can be sound whose application requires us to make a prophecy of that sort in the guise of a legal decision. The judicial process simply is not adequate to a trial of such far-flung issues. The answers given would reflect our own political predilections and nothing more.

The authors of the clear and present danger test never applied it to a case like this, nor would I. If applied as it is proposed here, it means that the Communist plotting is protected during its period of incubation; its preliminary stages of organization and preparation are immune from the law; the Government can move only after imminent action is manifest, when it would, of course, be too late.

### III.

The highest degree of constitutional protection is due to the individual acting without conspiracy. But even an individual cannot claim that the Constitution protects him in advocating or teaching overthrow of government by force or violence. I should suppose no one would doubt that Congress has power to make such attempted

overthrow a crime. But the contention is that one has the constitutional right to work up a public desire and will to do what it is a crime to attempt. I think direct incitement by speech or writing can be made a crime, and I think there can be a conviction without also proving that the odds favored its success by 99 to 1, or some other extremely high ratio.

The names of Mr. Justice Holmes and Mr. Justice Brandeis cannot be associated with such a doctrine of governmental disability. After the *Schenck* case, in which they set forth the clear and present danger test, they joined in these words of Mr. Justice Holmes, spoken for a unanimous Court:

> ". . . [T]he First Amendment while prohibiting legislation against free speech as such cannot have been, and obviously was not, intended to give immunity for every possible use of language. *Robertson* v. *Baldwin,* 165 U. S. 275, 281. We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counselling of a murder within the jurisdiction of Congress would be an unconstitutional interference with free speech." *Frohwerk* v. *United States,* 249 U. S. 204, 206.

The same doctrine was earlier stated in *Fox* v. *Washington,* 236 U. S. 273, 277, and that case was recently and with approval cited in *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490, 502.

As aptly stated by Judge Learned Hand in *Masses Publishing Co.* v. *Patten,* 244 F. 535, 540: "One may not counsel or advise others to violate the law as it stands. Words are not only the keys of persuasion, but the triggers of action, and those which have no purport but to counsel the violation of law cannot by any latitude of interpretation be a part of that public opinion which is the final source of government in a democratic state."

Of course, it is not always easy to distinguish teaching or advocacy in the sense of incitement from teaching or advocacy in the sense of exposition or explanation. It is a question of fact in each case.

## IV.

What really is under review here is a conviction of conspiracy, after a trial for conspiracy, on an indictment charging conspiracy, brought under a statute outlawing conspiracy. With due respect to my colleagues, they seem to me to discuss anything under the sun except the law of conspiracy. One of the dissenting opinions even appears to chide me for "invoking the law of conspiracy." As that is the case before us, it may be more amazing that its reversal can be proposed without even considering the law of conspiracy.

The Constitution does not make conspiracy a civil right. The Court has never before done so and I think it should not do so now. Conspiracies of labor unions, trade associations, and news agencies have been condemned, although accomplished, evidenced and carried out, like the conspiracy here, chiefly by letter-writing, meetings, speeches and organization. Indeed, this Court seems, particularly in cases where the conspiracy has economic ends, to be applying its doctrines with increasing severity. While I consider criminal conspiracy a dragnet device capable of perversion into an instrument of injustice in the hands of a partisan or complacent judiciary, it has an established place in our system of law, and no reason appears for applying it only to concerted action claimed to disturb interstate commerce and withholding it from those claimed to undermine our whole Government.[13]

---

[13] These dangers were more fully set out in *Krulewitch* v. *United States*, 336 U. S. 440, 445.

The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish.   Thus, we recently held in *Pinkerton* v. *United States,* 328 U. S. 640, 643–644, "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established. . . .   And the plea of double jeopardy is no defense to a conviction for both offenses. . . ."

So far does this doctrine reach that it is well settled that Congress may make it a crime to conspire with others to do what an individual may lawfully do on his own. This principle is illustrated in conspiracies that violate the antitrust laws as sustained and applied by this Court. Although one may raise the prices of his own products, and many, acting without concert, may do so, the moment they conspire to that end they are punishable.   The same principle is applied to organized labor.   Any workman may quit his work for any reason, but concerted actions to the same end are in some circumstances forbidden. National Labor Relations Act, as amended, 61 Stat. 136, § 8 (b), 29 U. S. C. § 158 (b).

The reasons underlying the doctrine that conspiracy may be a substantive evil in itself, apart from any evil it may threaten, attempt, or accomplish, are peculiarly appropriate to conspiratorial Communism.

> "The reason for finding criminal liability in case of a combination to effect an unlawful end or to use unlawful means, where none would exist, even though the act contemplated were actually committed by an individual, is that a combination of persons to commit a wrong, either as an end or as a means to an end, is so much more dangerous, because of its increased power to do wrong, because it is more difficult

to guard against and prevent the evil designs of a group of persons than of a single person, and because of the terror which fear of such a combination tends to create in the minds of people." [14]

There is lamentation in the dissents about the injustice of conviction in the absence of some overt act. Of course, there has been no general uprising against the Government, but the record is replete with acts to carry out the conspiracy alleged, acts such as always are held sufficient to consummate the crime where the statute requires an overt act.

But the shorter answer is that no overt act is or need be required. The Court, in antitrust cases, early upheld the power of Congress to adopt the ancient common law that makes conspiracy itself a crime. Through Mr. Justice Holmes, it said: "Coming next to the objection that no overt act is laid, the answer is that the Sherman Act punishes the conspiracies at which it is aimed on the common law footing—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability." *Nash* v. *United States,* 229 U. S. 373, 378. Reiterated, *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 252. It is not to be supposed that the power of Congress to protect the Nation's existence is more limited than its power to protect interstate commerce.

Also, it is urged that since the conviction is for conspiracy to teach and advocate, and to organize the Communist Party to teach and advocate, the First Amendment is violated, because freedoms of speech and press protect teaching and advocacy regardless of what is taught or advocated. I have never thought that to be the law.

---

[14] Miller on Criminal Law, 110. Similar reasons have been reiterated by this Court. *United States* v. *Rabinowich,* 238 U. S. 78, 88; *Pinkerton* v. *United States,* 328 U. S. 640, 643–644.

I do not suggest that Congress could punish conspiracy to advocate something, the doing of which it may not punish. Advocacy or exposition of the doctrine of communal property ownership, or any political philosophy unassociated with advocacy of its imposition by force or seizure of government by unlawful means could not be reached through conspiracy prosecution. But it is not forbidden to put down force or violence, it is not forbidden to punish its teaching or advocacy, and the end being punishable, there is no doubt of the power to punish conspiracy for the purpose.

The defense of freedom of speech or press has often been raised in conspiracy cases, because, whether committed by Communists, by businessmen, or by common criminals, it usually consists of words written or spoken, evidenced by letters, conversations, speeches or documents. Communication is the essence of every conspiracy, for only by it can common purpose and concert of action be brought about or be proved. However, when labor unions raised the defense of free speech against a conspiracy charge, we unanimously said:

> "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now. . . .

> . . . . .

> ". . . It is true that the agreements and course of conduct here were as in most instances brought about through speaking or writing. But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. . . . Such an expansive interpreta-

tion of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490, 498, 502.

A contention by the press itself, in a conspiracy case, that it was entitled to the benefits of the "clear and present danger" test, was curtly rebuffed by this Court, saying: "Nor is a publisher who engages in business practices made unlawful by the Sherman Act entitled to a partial immunity by reason of the 'clear and present danger' doctrine . . . . Formulated as it was to protect liberty of thought and of expression, it would degrade the clear and present danger doctrine to fashion from it a shield for business publishers who engage in business practices condemned by the Sherman Act. . . ." *Associated Press* v. *United States,* 326 U. S. 1, 7. I should think it at least as "degrading" to fashion of it a shield for conspirators whose ultimate purpose is to capture or overthrow the Government.

In conspiracy cases the Court not only has dispensed with proof of clear and present danger but even of power to create a danger: "It long has been settled, however, that a 'conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy.' . . . Petitioners, for example, might have been convicted here of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy . . . ." *American Tobacco Co.* v. *United States,* 328 U. S. 781, 789.

Having held that a conspiracy alone is a crime and its consummation is another, it would be weird legal reasoning to hold that Congress could punish the one only if there was "clear and present danger" of the second. This

would compel the Government to prove two crimes in order to convict for one.

When our constitutional provisions were written, the chief forces recognized as antagonists in the struggle between authority and liberty were the Government on the one hand and the individual citizen on the other. It was thought that if the state could be kept in its place the individual could take care of himself.

In more recent times these problems have been complicated by the intervention between the state and the citizen of permanently organized, well-financed, semisecret and highly disciplined political organizations. Totalitarian groups here and abroad perfected the technique of creating private paramilitary organizations to coerce both the public government and its citizens. These organizations assert as against our Government all of the constitutional rights and immunities of individuals and at the same time exercise over their followers much of the authority which they deny to the Government. The Communist Party realistically is a state within a state, an authoritarian dictatorship within a republic. It demands these freedoms, not for its members, but for the organized party. It denies to its own members at the same time the freedom to dissent, to debate, to deviate from the party line, and enforces its authoritarian rule by crude purges, if nothing more violent.

The law of conspiracy has been the chief means at the Government's disposal to deal with the growing problems created by such organizations. I happen to think it is an awkward and inept remedy, but I find no constitutional authority for taking this weapon from the Government. There is no constitutional right to "gang up" on the Government.

While I think there was power in Congress to enact this statute and that, as applied in this case, it cannot be

held unconstitutional,[15] I add that I have little faith in the long-range effectiveness of this conviction to stop the rise of the Communist movement. Communism will not go to jail with these Communists. No decision by this Court can forestall revolution whenever the existing government fails to command the respect and loyalty of the people and sufficient distress and discontent is allowed to grow up among the masses. Many failures by fallen governments attest that no government can long prevent revolution by outlawry.[16] Corruption, ineptitude, inflation, oppressive taxation, militarization, injustice, and loss of leadership capable of intellectual initiative in domestic or foreign affairs are allies on which the Com-

---

[15] The defendants have had the benefit so far in this case of all the doubts and confusions afforded by attempts to apply the "clear and present danger" doctrine. While I think it has no proper application to the case, these efforts have been in response to their own contentions and favored rather than prejudiced them. There is no call for reversal on account of it.

[16] The pathetically ineffective efforts of free European states to overcome feebleness of the Executive and decomposition of the Legislative branches of government by legal proscriptions are reviewed in Loewenstein, Legislative Control of Political Extremism in European Democracies, 38 Col. L. Rev. 591, 725 (1938). The Nazi Party seizure of power in Germany occurred while both it and its Communist counterpart were under sentence of illegality from the courts of the Weimar Republic. The German Criminal Code struck directly at the disciplinary system of totalitarian parties. It provided:

"The participation in an organization the existence, constitution, or purposes of which are to be kept secret from the Government, or in which obedience to unknown superiors or unconditional obedience to known superiors is pledged, is punishable by imprisonment up to six months for the members and from one month to one year for the founders and officers. Public officials may be deprived of the right to hold public office for a period of from one to five years." 2 Nazi Conspiracy and Aggression (GPO 1946) 11.

The Czar's government of Russia fell while the Communist leaders were in exile. See n. 7. Instances of similar failures could be multiplied indefinitely.

munists count to bring opportunity knocking to their door. Sometimes I think they may be mistaken. But the Communists are not building just for today—the rest of us might profit by their example.

Mr. Justice Black, dissenting.

Here again, as in *Breard* v. *Alexandria, post,* p. 622, decided this day, my basic disagreement with the Court is not as to how we should explain or reconcile what was said in prior decisions but springs from a fundamental difference in constitutional approach. Consequently, it would serve no useful purpose to state my position at length.

At the outset I want to emphasize what the crime involved in this case is, and what it is not. These petitioners were not charged with an attempt to overthrow the Government. They were not charged with overt acts of any kind designed to overthrow the Government. They were not even charged with saying anything or writing anything designed to overthrow the Government. The charge was that they agreed to assemble and to talk and publish certain ideas at a later date: The indictment is that they conspired to organize the Communist Party and to use speech or newspapers and other publications in the future to teach and advocate the forcible overthrow of the Government. No matter how it is worded, this is a virulent form of prior censorship of speech and press, which I believe the First Amendment forbids. I would hold § 3 of the Smith Act authorizing this prior restraint unconstitutional on its face and as applied.

But let us assume, contrary to all constitutional ideas of fair criminal procedure, that petitioners although not indicted for the crime of actual advocacy, may be punished for it. Even on this radical assumption, the other opinions in this case show that the only way to affirm

these convictions is to repudiate directly or indirectly the established "clear and present danger" rule. This the Court does in a way which greatly restricts the protections afforded by the First Amendment. The opinions for affirmance indicate that the chief reason for jettisoning the rule is the expressed fear that advocacy of Communist doctrine endangers the safety of the Republic. Undoubtedly, a governmental policy of unfettered communication of ideas does entail dangers. To the Founders of this Nation, however, the benefits derived from free expression were worth the risk. They embodied this philosophy in the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." I have always believed that the First Amendment is the keystone of our Government, that the freedoms it guarantees provide the best insurance against destruction of all freedom. At least as to speech in the realm of public matters, I believe that the "clear and present danger" test does not "mark the furthermost constitutional boundaries of protected expression" but does "no more than recognize a minimum compulsion of the Bill of Rights." *Bridges* v. *California,* 314 U. S. 252, 263.

So long as this Court exercises the power of judicial review of legislation, I cannot agree that the First Amendment permits us to sustain laws suppressing freedom of speech and press on the basis of Congress' or our own notions of mere "reasonableness." Such a doctrine waters down the First Amendment so that it amounts to little more than an admonition to Congress. The Amendment as so construed is not likely to protect any but those "safe" or orthodox views which rarely need its protection. I must also express my objection to the holding because, as MR. JUSTICE DOUGLAS' dissent shows, it sanctions the determination of a crucial issue of fact by the judge rather than by the jury. Nor can I let this opportunity

pass without expressing my objection to the severely limited grant of certiorari in this case which precluded consideration here of at least two other reasons for reversing these convictions: (1) the record shows a discriminatory selection of the jury panel which prevented trial before a representative cross-section of the community; (2) the record shows that one member of the trial jury was violently hostile to petitioners before and during the trial.

Public opinion being what it now is, few will protest the conviction of these Communist petitioners. There is hope, however, that in calmer times, when present pressures, passions and fears subside, this or some later Court will restore the First Amendment liberties to the high preferred place where they belong in a free society.

MR. JUSTICE DOUGLAS, dissenting.

If this were a case where those who claimed protection under the First Amendment were teaching the techniques of sabotage, the assassination of the President, the filching of documents from public files, the planting of bombs, the art of street warfare, and the like, I would have no doubts. The freedom to speak is not absolute; the teaching of methods of terror and other seditious conduct should be beyond the pale along with obscenity and immorality. This case was argued as if those were the facts. The argument imported much seditious conduct into the record. That is easy and it has popular appeal, for the activities of Communists in plotting and scheming against the free world are common knowledge. But the fact is that no such evidence was introduced at the trial. There is a statute which makes a seditious conspiracy unlawful.[1] Petitioners, however, were not

---

[1] 18 U. S. C. § 2384 provides: "If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the

charged with a "conspiracy to overthrow" the Government. They were charged with a conspiracy to form a party and groups and assemblies of people who teach and advocate the overthrow of our Government by force or violence and with a conspiracy to advocate and teach its overthrow by force and violence.[2] It may well be that indoctrination in the techniques of terror to destroy the Government would be indictable under either statute. But the teaching which is condemned here is of a different character.

So far as the present record is concerned, what petitioners did was to organize people to teach and themselves teach the Marxist-Leninist doctrine contained chiefly in four books:[3] Stalin, Foundations of Leninism (1924); Marx and Engels, Manifesto of the Communist Party (1848); Lenin, The State and Revolution (1917); History of the Communist Party of the Soviet Union (B.) (1939).

Those books are to Soviet Communism what Mein Kampf was to Nazism. If they are understood, the ugliness of Communism is revealed, its deceit and cunning are exposed, the nature of its activities becomes apparent, and the chances of its success less likely. That is not, of course, the reason why petitioners chose these books for their classrooms. They are fervent Communists to whom these volumes are gospel. They preached the creed with the hope that some day it would be acted upon.

---

Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined not more than $5,000 or imprisoned not more than six years, or both."

[2] 54 Stat. 671, 18 U. S. C. §§ 10, 11.

[3] Other books taught were Stalin, Problems of Leninism, Strategy and Tactics of World Communism (H. R. Doc. No. 619, 80th Cong., 2d Sess.), and Program of the Communist International.

The opinion of the Court does not outlaw these texts nor condemn them to the fire, as the Communists do literature offensive to their creed. But if the books themselves are not outlawed, if they can lawfully remain on library shelves, by what reasoning does their use in a classroom become a crime? It would not be a crime under the Act to introduce these books to a class, though that would be teaching what the creed of violent overthrow of the Government is. The Act, as construed, requires the element of intent—that those who teach the creed believe in it. The crime then depends not on what is taught but on who the teacher is. That is to make freedom of speech turn not on *what is said,* but on the *intent* with which it is said. Once we start down that road we enter territory dangerous to the liberties of every citizen.

There was a time in England when the concept of constructive treason flourished. Men were punished not for raising a hand against the king but for thinking murderous thoughts about him. The Framers of the Constitution were alive to that abuse and took steps to see that the practice would not flourish here. Treason was defined to require overt acts—the evolution of a plot against the country into an actual project. The present case is not one of treason. But the analogy is close when the illegality is made to turn on intent, not on the nature of the act. We then start probing men's minds for motive and purpose; they become entangled in the law not for what they did but *for what they thought;* they get convicted not for what they said but for the purpose with which they said it.

Intent, of course, often makes the difference in the law. An act otherwise excusable or carrying minor penalties may grow to an abhorrent thing if the evil intent is present. We deal here, however, not with ordinary acts but with speech, to which the Constitution has given a special sanction.

584

The vice of treating speech as the equivalent of overt acts of a treasonable or seditious character is emphasized by a concurring opinion, which by invoking the law of conspiracy makes speech do service for deeds which are dangerous to society. The doctrine of conspiracy has served divers and oppressive purposes and in its broad reach can be made to do great evil. But never until today has anyone seriously thought that the ancient law of conspiracy could constitutionally be used to turn speech into seditious conduct. Yet that is precisely what is suggested. I repeat that we deal here with speech alone, not with speech *plus* acts of sabotage or unlawful conduct. Not a single seditious act is charged in the indictment. To make a lawful speech unlawful because two men conceive it is to raise the law of conspiracy to appalling proportions. That course is to make a radical break with the past and to violate one of the cardinal principles of our constitutional scheme.

Free speech has occupied an exalted position because of the high service it has given our society. Its protection is essential to the very existence of a democracy. The airing of ideas releases pressures which otherwise might become destructive. When ideas compete in the market for acceptance, full and free discussion exposes the false and they gain few adherents. Full and free discussion even of ideas we hate encourages the testing of our own prejudices and preconceptions. Full and free discussion keeps a society from becoming stagnant and unprepared for the stresses and strains that work to tear all civilizations apart.

Full and free discussion has indeed been the first article of our faith. We have founded our political system on it. It has been the safeguard of every religious, political, philosophical, economic, and racial group amongst us. We have counted on it to keep us from embracing what is cheap and false; we have trusted the common sense of our

people to choose the doctrine true to our genius and to reject the rest. This has been the one single outstanding tenet that has made our institutions the symbol of freedom and equality. We have deemed it more costly to liberty to suppress a despised minority than to let them vent their spleen. We have above all else feared the political censor. We have wanted a land where our people can be exposed to all the diverse creeds and cultures of the world.

There comes a time when even speech loses its constitutional immunity. Speech innocuous one year may at another time fan such destructive flames that it must be halted in the interests of the safety of the Republic. That is the meaning of the clear and present danger test. When conditions are so critical that there will be no time to avoid the evil that the speech threatens, it is time to call a halt. Otherwise, free speech which is the strength of the Nation will be the cause of its destruction.

Yet free speech is the rule, not the exception. The restraint to be constitutional must be based on more than fear, on more than passionate opposition against the speech, on more than a revolted dislike for its contents. There must be some immediate injury to society that is likely if speech is allowed. The classic statement of these conditions was made by Mr. Justice Brandeis in his concurring opinion in *Whitney* v. *California,* 274 U. S. 357, 376–377,

"Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger ap-

prehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one. Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability. Propagation of the criminal state of mind by teaching syndicalism increases it. Advocacy of law-breaking heightens it still further. But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated.

"Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. *If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.*" (Italics added.)

I had assumed that the question of the clear and present danger, being so critical an issue in the case, would be a matter for submission to the jury. It was squarely held in *Pierce* v. *United States,* 252 U. S. 239, 244, to be a jury question. Mr. Justice Pitney, speaking for the Court, said, "Whether the statement contained in the pamphlet had a natural tendency to produce the forbidden consequences, as alleged, was a question to be determined not upon demurrer but by the jury at the trial." That is the only time the Court has passed on the issue. None of our other decisions is contrary. Nothing said in any of the nonjury cases has detracted from that ruling.[4] The statement in *Pierce* v. *United States, supra,* states the law as it has been and as it should be. The Court, I think, errs when it treats the question as one of law.

Yet, whether the question is one for the Court or the jury, there should be evidence of record on the issue. This record, however, contains no evidence whatsoever showing that the acts charged, *viz.,* the teaching of the Soviet theory of revolution with the hope that it will be realized, have created any clear and present danger to the Nation. The Court, however, rules to the contrary. It says, "The formation by petitioners of such a highly organized conspiracy, with rigidly disciplined members subject to call when the leaders, these petitioners, felt that the time had come for action, coupled with the inflammable nature of world conditions, similar uprisings in other countries, and the touch-and-go nature of our relations with countries with whom petitioners were in the very least ideologically attuned, convince us that their convictions were justified on this score."

That ruling is in my view not responsive to the issue in the case. We might as well say that the speech of

---

[4] The cases which reached the Court are analyzed in the Appendix attached to this opinion, *post,* p. 591.

petitioners is outlawed because Soviet Russia and her Red Army are a threat to world peace.

The nature of Communism as a force on the world scene would, of course, be relevant to the issue of clear and present danger of petitioners' advocacy within the United States. But the primary consideration is the strength and tactical position of petitioners and their converts in this country. On that there is no evidence in the record. If we are to take judicial notice of the threat of Communists within the nation, it should not be difficult to conclude that *as a political party* they are of little consequence. Communists in this country have never made a respectable or serious showing in any election. I would doubt that there is a village, let alone a city or county or state, which the Communists could carry. Communism in the world scene is no bogeyman; but Communism as a political faction or party in this country plainly is. Communism has been so thoroughly exposed in this country that it has been crippled as a political force. Free speech has destroyed it as an effective political party. It is inconceivable that those who went up and down this country preaching the doctrine of revolution which petitioners espouse would have any success. In days of trouble and confusion, when bread lines were long, when the unemployed walked the streets, when people were starving, the advocates of a short-cut by revolution might have a chance to gain adherents. But today there are no such conditions. The country is not in despair; the people know Soviet Communism; the doctrine of Soviet revolution is exposed in all of its ugliness and the American people want none of it.

How it can be said that there is a clear and present danger that this advocacy will succeed is, therefore, a mystery. Some nations less resilient than the United States, where illiteracy is high and where democratic traditions are only budding, might have to take drastic

steps and jail these men for merely speaking their creed. But in America they are miserable merchants of unwanted ideas; their wares remain unsold. The fact that their ideas are abhorrent does not make them powerful.

The political impotence of the Communists in this country does not, of course, dispose of the problem. Their numbers; their positions in industry and government; the extent to which they have in fact infiltrated the police, the armed services, transportation, stevedoring, power plants, munitions works, and other critical places—these facts all bear on the likelihood that their advocacy of the Soviet theory of revolution will endanger the Republic. But the record is silent on these facts. If we are to proceed on the basis of judicial notice, it is impossible for me to say that the Communists in this country are so potent or so strategically deployed that they must be suppressed for their speech. I could not so hold unless I were willing to conclude that the activities in recent years of committees of Congress, of the Attorney General, of labor unions, of state legislatures, and of Loyalty Boards were so futile as to leave the country on the edge of grave peril. To believe that petitioners and their following are placed in such critical positions as to endanger the Nation is to believe the incredible. It is safe to say that the followers of the creed of Soviet Communism are known to the F. B. I.; that in case of war with Russia they will be picked up overnight as were all prospective saboteurs at the commencement of World War II; that the invisible army of petitioners is the best known, the most beset, and the least thriving of any fifth column in history. Only those held by fear and panic could think otherwise.

This is my view if we are to act on the basis of judicial notice. But the mere statement of the opposing views indicates how important it is that we know the facts before we act. Neither prejudice nor hate nor senseless

fear should be the basis of this solemn act. Free speech—
the glory of our system of government—should not be
sacrificed on anything less than plain and objective proof
of danger that the evil advocated is imminent. On this
record no one can say that petitioners and their converts
are in such a strategic position as to have even the slightest
chance of achieving their aims.

The First Amendment provides that "Congress shall
make no law . . . abridging the freedom of speech." The
Constitution provides no exception. This does not mean,
however, that the Nation need hold its hand until it is in
such weakened condition that there is no time to protect
itself from incitement to revolution. Seditious conduct
can always be punished. But the command of the First
Amendment is so clear that we should not allow Congress
to call a halt to free speech except in the extreme case of
peril from the speech itself. The First Amendment
makes confidence in the common sense of our people and
in their maturity of judgment the great postulate of our
democracy. Its philosophy is that violence is rarely, if
ever, stopped by denying civil liberties to those advocating
resort to force. The First Amendment reflects the phi-
losophy of Jefferson "that it is time enough for the
rightful purposes of civil government, for its officers
to interfere when principles break out into overt acts
against peace and good order." [5] The political censor has
no place in our public debates. Unless and until extreme
and necessitous circumstances are shown, our aim should
be to keep speech unfettered and to allow the processes

---

[5] 12 Hening's Stat. (Virginia 1823), c. 34, p. 84. Whipple, Our
Ancient Liberties (1927), p. 95, states: "This idea that the limit on
freedom of speech or press should be set only by an actual overt act
was not new. It had been asserted by a long line of distinguished
thinkers including John Locke, Montesquieu in his *The Spirit of
the Laws* ('Words do not constitute an overt act'), the Rev. Phillip
Furneaux, James Madison, and Thomas Jefferson."

of law to be invoked only when the provocateurs among us move from speech to action.

Vishinsky wrote in 1938 in The Law of the Soviet State, "In our state, naturally, there is and can be no place for freedom of speech, press, and so on for the foes of socialism."

Our concern should be that we accept no such standard for the United States. Our faith should be that our people will never give support to these advocates of revolution, so long as we remain loyal to the purposes for which our Nation was founded.

APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS.

There have been numerous First Amendment cases before the Court raising the issue of clear and present danger since Mr. Justice Holmes first formulated the test in *Schenck* v. *United States,* 249 U. S. 47, 52. Most of them, however, have not involved jury trials.

The cases which may be deemed at all relevant to our problem can be classified as follows:

CONVICTIONS FOR CONTEMPT OF COURT (NON-JURY): *Near* v. *Minnesota,* 283 U. S. 697; *Bridges* v. *California,* 314 U. S. 252; *Thomas* v. *Collins,* 323 U. S. 516; *Pennekamp* v. *Florida,* 328 U. S. 331; *Craig* v. *Harney,* 331 U. S. 367.

CONVICTIONS BY STATE COURTS SITTING WITHOUT JURIES, GENERALLY FOR VIOLATIONS OF LOCAL ORDINANCES: *Lovell* v. *Griffin,* 303 U. S. 444; *Schneider* v. *State,* 308 U. S. 147; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Marsh* v. *Alabama,* 326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517; *Winters* v. *New York,* 333 U. S. 507; *Saia* v. *New York,* 334 U. S. 558; *Kovacs* v. *Cooper,* 336 U. S. 77; *Kunz* v. *New York,* 340 U. S. 290; *Feiner* v. *New York,* 340 U. S. 315.

INJUNCTIONS AGAINST ENFORCEMENT OF STATE OR LOCAL LAWS (NON-JURY): *Grosjean* v. *American Press Co.,* 297

U. S. 233; *Hague* v. *C. I. O.,* 307 U. S. 496; *Minersville School District* v. *Gobitis,* 310 U. S. 586; *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624.

ADMINISTRATIVE PROCEEDINGS (NON-JURY): *Bridges* v. *Wixon,* 326 U. S. 135; *Schneiderman* v. *United States,* 320 U. S. 118; *American Communications Association* v. *Douds,* 339 U. S. 382.

CASES TRIED BEFORE JURIES FOR VIOLATIONS OF STATE LAWS DIRECTED AGAINST ADVOCACY OF ANARCHY, CRIMINAL SYNDICALISM, ETC.: *Gilbert* v. *Minnesota,* 254 U. S. 325; *Gitlow* v. *New York,* 268 U. S. 652; *Whitney* v. *California,* 274 U. S. 357; *Fiske* v. *Kansas,* 274 U. S. 380; *Stromberg* v. *California,* 283 U. S. 359; *De Jonge* v. *Oregon,* 299 U. S. 353; *Herndon* v. *Lowry,* 301 U. S. 242; *Taylor* v. *Mississippi,* 319 U. S. 583; or for minor local offenses: *Cox* v. *New Hampshire,* 312 U. S. 569; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Terminiello* v. *Chicago,* 337 U. S. 1; *Niemotko* v. *Maryland,* 340 U. S. 268.

FEDERAL PROSECUTIONS BEFORE JURIES UNDER THE ESPIONAGE ACT OF 1917 FOLLOWING WORLD WAR I: *Schenck* v. *United States,* 249 U. S. 47; *Frohwerk* v. *United States,* 249 U. S. 204; *Debs* v. *United States,* 249 U. S. 211; *Abrams* v. *United States,* 250 U. S. 616; *Schaefer* v. *United States,* 251 U. S. 466; *Pierce* v. *United States,* 252 U. S. 239. *Pierce* v. *United States* ruled that the question of clear and present danger was for the jury. In the other cases in this group the question whether the issue was for the court or the jury was not raised or passed upon.

FEDERAL PROSECUTION BEFORE A JURY UNDER THE ESPIONAGE ACT OF 1917 FOLLOWING WORLD WAR II: *Hartzel* v. *United States,* 322 U. S. 680. The jury was instructed on clear and present danger in terms drawn from the language of Mr. Justice Holmes in *Schenck* v. *United States, supra,* p. 52. The Court reversed the conviction on the ground that there had not been sufficient evidence for submission of the case to the jury.